**UNITED STATES of America,
Plaintiff,**

v.

**Ali HIJAZI, Defendant.**

Case No. 05–40024–02.

United States District Court,
C.D. Illinois,
Rock Island Division.

July 18, 2011.

878

Catherine A. Bernard, Vincent J. Connelly, Dana S. Douglas, Mayer Brown LLP, Leonard L. Cavise, DePaul College of Law, Chicago, IL, Catherine E. Stetson, Ty Cobb, Hogan Lovells US LLP, H. Christopher Bartolomucci, Bancroft PLLC, William H. Rawson, Thomas L. McGovern, III, Hogan Lovells US LLP, Washington, DC, for Defendant.

Jeffrey B. Lang, Matthew J. Cannon, US Atty., Rock Island, IL, John A. Michelich, US Atty., Washington, DC, Joseph H. Hartzler, US Atty., Springfield, IL, for Plaintiff.

## ORDER & OPINION

JOE BILLY McDADE, Senior District Judge.

This case is before the Court pursuant to a writ of mandamus order issued July 1, 2011, from the Seventh Circuit to promptly rule on Defendant Hijazi's motions to dismiss (Docs. 15, 131, 174) the Indictment pending against him. Before the Court are Defendant's Motion to Dismiss Indictment (Doc. 15) and Memorandum in Support (Doc. 16), Defendant's Motion to Dismiss Second Superseding Indictment (Doc. 131) and Memorandum in Support (Doc. 180), Defendant's Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174) and Memorandum in Support (Doc. 175), Memorandum of Amici Curiae in Support of Defendant's Motion to Dismiss Based on Lack of Jurisdiction (Doc. 166), the Government's Consolidated Response to Defendant Hijazi's Motions to Dismiss the Indictment (Doc. 217), and Defendant's Reply Brief in Support of his Motions to Dismiss (Doc. 222). On May 7, 2010, Magistrate Judge Cudmore issued a Report and Recommendation recommending that Defendant's Motions to Dismiss be denied (Doc. 230). Defendant filed Objections to the Report and Recommendation (Doc. 233), the Government filed a Response to Defendant's Objections (Doc. 235) and Defendant filed a Reply thereto (Doc. 238).[1] For the following reasons, the Report and Recommendation is AFFIRMED and Defendant's Motions to Dismiss are DENIED.

### BACKGROUND

On March 16, 2005, the United States Government ("Government") charged Defendant Ali Hijazi ("Hijazi") and Jeff Mazon ("Mazon") with violations of the Major Fraud Act, 18 U.S.C. § 1031(a), the wire

---

1. Also before the Court are Defendant's Offering of Additional Document and Citation of New Authority in Support of his Motion to Dismiss the Second Superseding Indictment (Doc. 161), Defendant's Submission of Seventh Circuit Briefs and Other Appellate Filings in Support of Motions to Dismiss (Doc. 215), a Supplemental Authority filed by the Government (Doc. 225) and Defendant's Response thereto (Doc. 227), and Defendant's Notice of New Supreme Court Authority (Doc. 236) and the Government's Response thereto (Doc. 237).

fraud statute, 18 U.S.C. § 1343, and the aiding and abetting statute, 18 U.S.C. § 2. (Doc. 1). On May 20, 2005, the Government filed a Superseding Indictment against Hijazi and Mazon (Doc. 21), and on August 3, 2006, it filed a Second Superseding Indictment (Doc. 59). The Second Superseding Indictment alleges the following information, taken as true for purposes of ruling on the pending motions to dismiss. *See United States v. White,* 610 F.3d 956, 959 (7th Cir.2010).

In late 2001, the U.S. Army contracted with Kellogg Brown & Root Services ("KBR"), an American company, to provide property and services to the military at locations around the world, including Kuwait. (Doc. 59 ¶¶ 3–8). One service that KBR contracted to perform was to store and dispense fuel at the Aerial Port of Debarkation ("APOD") in Kuwait. (Doc. 59 ¶ 11). The APOD was the airport used by the United States military for military operations in Kuwait. (Doc. 59 ¶ 11). As was common practice for KBR, it sought out a subcontractor to perform work related to the storage and dispensation of fuel at the APOD; the subcontractor would invoice KBR for their work, which KBR would then pay and subsequently invoice the United States. (Doc. 59 ¶¶ 8, 20).

From December 2002 through June 2003, Jeff Mazon was the Procurement, Materials, and Property Manager for KBR stationed in Kuwait. (Doc. 59 ¶ 12). Accordingly, it was his duty to negotiate, execute, and administer subcontracts such as the one for fuel storage and dispensation at the APOD. (Doc. 59 ¶¶ 12, 20). On February 2, 2003, Mazon solicited bids by electronic mail from potential subcontrac-

tors for fuel tankers to store and dispense fuel for a six month period at the APOD; KBR had estimated that the cost of the subcontract would be $685,050. (Doc. 59 ¶ 20). One of the bids received by Mazon was from LaNouvelle General Trading & Contracting Co. ("LaNouvelle"), a Kuwaiti company of which Hijazi [2] was the managing partner. (Doc. 59 ¶¶ 13, 21). The LaNouvelle bid was approximately $1,673,100. (Doc. 59 ¶ 21). Mazon received one other bid for $1,891,890. (Doc. 59 ¶ 21).

Prior to awarding the subcontract, Mazon substantially inflated both bids. (Doc. 59 ¶ 22). He raised LaNouvelle's bid to approximately $5,521,230, and the competing bid to approximately $6,243,237. (Doc. 59 ¶ 22). On February 14, 2003, Mazon and Hijazi signed a subcontract ("Subcontract 39") under the inflated price, which was more than $4.8 million more than KBR's estimate for the work, and more than $3.8 million more than LaNouvelle's original bid. (Doc. 59 ¶ 23). Hijazi signed Subcontract 39 knowing that the price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of LaNouvelle. (Doc. 59 ¶ 16). Subcontract 39 indicates that the United States Government was the Owner, for whom work was being performed, and that all escorts and security monitors and fuel costs incurred in the sublet work would be covered by the United States. (Doc. 226–1 at 4–5).

From March 2003 through August 2003, Mazon and Hijazi caused LaNouvelle to submit six different invoices to KBR for payment under Subcontract 39 in the total amount of $5,521,230, which was the inflated price. (Doc. 59 ¶ 26). KBR paid La-

**2.** Hijazi is a citizen of Lebanon and lifelong resident of Kuwait. He has traveled to the United States only once, in 1993, under circumstances unrelated to this case. His com-

pany, La Nouvelle, is a Kuwaiti company with no American ownership interests. (Doc. 233 at 6).

Nouvelle in full on each of these six invoices. (Doc. 59 ¶ 26). Mazon and Hijazi then caused KBR to submit four invoices to the United States Government for the costs incurred pursuant to Subcontract 39, which the Government paid in September and December of 2003. (Doc. 59 ¶ 27).

Sometime in September 2003, Hijazi gave a $1 million draft to Mazon in exchange for Mazon's favorable treatment of LaNouvelle. (Doc. 59 ¶ 28). The men also executed a promissory note as a ruse to make the $1 million payment appear to be a loan from Hijazi to Mazon. (Doc. 59 ¶ 28). However, on September 24, 2003, Hijazi sent Mazon an e-mail telling him that Hijazi considered "this whole lown [sic] (principal and interest) as totally your money...." (Doc. 59 ¶ 29). On October 1, 2003, Mazon tried unsuccessfully to deposit the $1 million in a U.S. bank. (Doc. 59 ¶ 30). On October 9, 2003, Hijazi sent Mazon a second e-mail, instructing him on how to deposit the money. (Doc. 59 ¶ 31). Hijazi told Mazon to open an offshore account with three different financial institutions and to deposit around $300,000 in each, under the auspices that it was from "consultancy work, business associates [sic], salaries abd [sic] bonuses, or any other reasoning." (Doc. 59 ¶ 31). On October 28, 2003, Mazon again attempted to deposit the $1 million at a second financial institution in the United States. (Doc. 59 ¶ 32).

In November 2003, a KBR investigator questioned Hijazi about Subcontract 39.

(Doc. 59 ¶ 33). The next day, Hijazi sent a third e-mail to Mazon stating "Please when you call your ex-friends in Kuwait [sic] please be very careful [sic] on what you say." (Doc. 59 ¶ 33). Mazon opened this e-mail while he was in the United States. (Doc. 59 ¶ 33).

Shortly after the original Indictment was returned against him, Hijazi voluntarily surrendered himself to authorities in Kuwait. (Doc. 133 at 2). However, he was quickly released and his posted bond was returned to him. (Doc. 133 at 2). On May 3, 2005, Hijazi, via American counsel, filed his first Motion to Dismiss the Indictment (Doc 15), claiming that his prosecution violated principles of extraterritoriality, international law, and due process. (Doc. 16). Rather than substantively respond to his Motion to Dismiss, the Government filed a Motion to Strike (Doc. 20), arguing that because Hijazi had not yet appeared for arraignment, the Court should not entertain his motion. After receiving a Report and Recommendation from Magistrate Judge Gorman (Doc. 30), this Court determined that it would not strike Hijazi's Motion to Dismiss, however it would defer its ruling until such time as Hijazi appeared for arraignment. (Doc. 36).[3]

Approximately one year later, on August 3, 2006, the Government filed the Second Superseding Indictment against Hijazi. (Doc. 53). On December 21, 2007, Hijazi filed a Motion to Dismiss the Second Superseding Indictment (Doc. 131). In this Motion, Hijazi raised the same three ob-

---

**3.** The Government made several attempts to obtain Hijazi after the Indictment was returned against him. In April 2005, the U.S. directed the International Criminal Police Organization ("INTERPOL") to issue a "red notice" on Hijazi, which "calls on member nations to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the U.S." (Doc. 217 at 48). Several months later, in September 2005, the Government made a formal request to the Kuwaiti Government to turn over Hijazi, but Kuwait refused and demanded that the charges against him be dropped. (Doc. 230 at 6). Because Kuwait refuses to turn over Hijazi, and Hijazi refuses to leave Kuwait (which he is under no legal obligation to do), the Government has been unable to bring him before the Court.

jections as he did to the original Indictment, and inserted two additional arguments: 1) that the Defense Cooperation Agreement between the United States and Kuwait barred his prosecution, and 2) that his case should be dismissed due to lack of prosecution. (Doc. 180). Again, the Government decided not to respond to the merits of Defendant's arguments and instead filed a Motion to Stay Ruling and Hold in Abeyance (Doc. 136). On September 4, 2008, this Court entered another Order in which it indicated that it would not consider Defendant's motions to dismiss until such time as he appeared for arraignment (Doc. 178).[4]

On December 11, 2009, the United States Court of Appeals for the Seventh Circuit granted Hijazi a writ of mandamus, and ordered this Court to rule upon Hijazi's pending motions to dismiss. (Doc. 213).[5] Although Hijazi had invited the Seventh Circuit to also rule upon the merits of his motions, the Court expressly declined to do so. *In re Hijazi*, 589 F.3d 401, 403 (7th Cir.2009). This Court referred Defendant's Motions to Magistrate Judge Cudmore, who entered a Report and Recommendation recommending that they be denied. (Doc. 230). Hijazi timely filed Objections (Doc. 233), to which the

Government responded (Doc. 235), and the matter is now ripe for review by this Court. In his Objections, Hijazi claims that the Report and Recommendation erred for four main reasons: 1) the R & R erred in concluding that the Court has jurisdiction over Hijazi; 2) the R & R erred in construing the Major Fraud Act and the wire fraud statute to apply extraterritorially to Hijazi; 3) the R & R erred in finding that the Defense Cooperation Agreement does not bar this prosecution; and 4) the R & R erred in concluding that the long pre-trial delay does not violate Hijazi's right to a speedy trial. (Doc. 233).[6]

■ A district court reviews *de novo* any portion of a Magistrate Judge's R & R to which an objection has been made. FED.R.CRIM.P. 59(b)(3). "The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." *Id.* Accordingly, the Court will address each of Hijazi's objections in turn.

## I. This Court's Jurisdiction Over Hijazi

Hijazi argues that the R & R erred in finding that the Court has jurisdiction over

---

**4.** One day before the Court entered this Order, Hijazi also filed his Motion to Dismiss Based on Sixth Amendment Right to Speedy Trial (Doc. 174).

**5.** In the meantime, this Court presided over two trials for Mazon pursuant to the Second Superseding Indictment, both of which resulted in hung juries. (Minute Entries of 4/30/08 & 10/20/08). Ultimately, the Government and Mazon reached a plea agreement under which the Government filed a misdemeanor false statement charge against Mazon in a separate case, to which he pled guilty in exchange for the dismissal of all charges in this case. (Docs. 210 & 215).

**6.** Hijazi also argues that the Magistrate Judge did not give due deference to the Seventh

Circuit's opinion in *In re Ali Hijazi*, 589 F.3d 401 (7th Cir.2009), which he claims has become the "law of the case." While the Court will specifically address Hijazi's concerns with the Magistrate's treatment of the Seventh Circuit opinion where they are relevant, as a general matter the Court notes that the Seventh Circuit expressly declined to rule on the merits of Hijazi's motions, and its discussion was directed solely at determining whether a ruling was necessary, not on what that ruling should be. *See In re Hijazi*, 589 F.3d at 403 ("We have concluded, however, that the district court ... is in a better position to address the merits in the first instance, and so we decline that invitation [to rule on the merits].").

him because: 1) he has minimal contacts with the United States and the contacts of Mazon may not be imputed to him; 2) jurisdiction violates his due process rights; and 3) jurisdiction is precluded by the dictates of international law. As will be discussed below, the Court finds that the statutes under which Hijazi has been charged are to apply extraterritorially, such that none of his conduct needed to take place within the United States for jurisdiction to be proper. *See United States v. Moncini,* 882 F.2d 401, 403 (9th Cir.1989) ("Jurisdiction is proper if the offense, or part of the offense, occurred within the United States ... Alternately, jurisdiction may be proper *even if no part of the offense occurred in the United States,* if grounds for exercising extraterritorial jurisdiction are present." (emphasis added)). Further, the Court finds that due process concerns are nearly identical to international law concerns, both of which require for jurisdictional purposes that Hijazi's conduct is alleged to have had, or was intended to have had a substantial effect within the United States, or was directed against the security of the state. Therefore, all three of these questions can be determined by an analysis of whether Hijazi's conduct was such that he can fairly be prosecuted pursuant to international law.[7]

### A. Due Process Concerns

In his Motion to Dismiss the Second Superseding Indictment, Hijazi argues that the exercise of criminal jurisdiction over him would violate due process. (Doc. 180 at 27). Hijazi bases his initial argument upon the due process standard creat-

ed by the Supreme Court for civil cases in *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Accordingly, he claims that "for the exercise of jurisdiction over a foreign defendant to comport with due process, there must be a 'substantial connection between the defendant and the forum' based on 'an action of the defendant purposefully directed toward the forum state.'" (Doc. 180 at 28 (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026)). While Hijazi recognizes that this standard had only been applied in the civil context, he claims that it could be adopted in his criminal case, because, if anything, "Due Process should provide greater protection in this context." (Doc. 180 at 28). Hijazi also relies on civil cases to argue that he did not purposefully direct any actions towards the United States, and thus that it cannot establish jurisdiction over him.[8]

In its Consolidated Response, the Government counters that the appropriate due process analysis in a criminal context such as this is whether the extraterritorial prosecution of a foreign defendant is "arbitrary or fundamentally unfair." (Doc. 217 at 39) (quoting *United States v. Yousef,* 327 F.3d 56, 111–12 (2d Cir.2003)). The Government goes on to point out that different courts have interpreted this language differently, with the Second and Ninth Circuits applying a test of whether there is a "sufficient nexus" between the defendant and the United States, *Yousef,* 327 F.3d at 111–12; *United States v. Davis,* 905 F.2d 245, 248–49 (9th Cir.1990), and others looking to principles of international law, *United States v. Cardales,* 168 F.3d 548, 553

---

7. As will be discussed, this is also in line with the Seventh Circuit's direction to consider "how much is enough?" for Hijazi to be prosecuted in the United States. *See In re Hijazi,* 589 F.3d at 412.

8. The Court finds Hijazi's reliance upon civil cases to be inapposite. Criminal jurisdiction is proper regardless of Hijazi's contacts with the United States so long as the charging statutes apply extraterritorially, and jurisdiction is in accordance with international law.

(1st Cir.1999); *United States v. Martinez–Hidalgo*, 993 F.2d 1052, 1056 (3rd Cir. 1993). (Doc. 217 at 39).

■ Neither the Seventh Circuit nor the Supreme Court have explicitly addressed due process requirements in the context of criminal jurisdiction over a foreign defendant. However, in its Opinion in this case, the Seventh Circuit indicated that this Court should look to principles of international law to determine whether Hijazi's contacts with the United States were sufficient to support his prosecution. *In re Hijazi*, 589 F.3d at 411–12. After examining the alleged contacts between Hijazi and the United States, the Seventh Circuit posited: "Critical to the decision of whether these contacts are adequate to support the U.S. proceeding is the question of 'how much is enough?'" *Id.* at 412. The Court immediately went on to say, "The Restatement (Third) of Foreign Relations Law .... takes the position that 'subject to § 403, a state has jurisdiction to prescribe law with respect to ... conduct outside its territory that has or is intended to have substantial effect within its territory.'" *Id.* Given this language by the Seventh Circuit and the fact that numerous other courts have applied principles of international law to the determination of whether due process was satisfied, the Court finds the appropriate due process analysis in this case to be performed under the rubric of international law.[9] Thus, it will address Hijazi's due process and international law concerns at the same time.

## B. International Law Concerns

### i. Substantial, Direct, Foreseeable Effect upon United States

Section 402 of the Restatement Third of Foreign Relations Law provides that,

"Subject to § 403, a state has jurisdiction to prescribe law with respect to ... (1)(c) conduct outside its territory that has or is intended to have substantial effect within its territory; ...; and (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests." These principles are known as the objective territorial theory, and the protective theory, respectively. "When an allegedly criminal act is performed *by an alien* on *foreign soil* courts in the United States have long held that if jurisdiction is to be extended over that act, it must be supported by either the Protective or the Objective territorial theory." *United States v. Columba–Colella*, 604 F.2d 356, 358 (5th Cir.1979) (emphasis added). This principle can be traced back all the way back to Justice Holmes, who stated in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."

■ Accordingly, to satisfy the first requirement under international law, the Indictments must allege that Hijazi's actions were intended to have a substantial effect within the United States, or that they were directed against the security of the state, or other state interests. The parties and the Magistrate spent considerable time discussing whether the conduct of Mazon can be attributed to Hijazi for purposes of examining Hijazi's conduct. As will be discussed below, the Court believes that it can be, however, in its view, the Second Superseding Indictment alleg-

---

9. Magistrate Judge Cudmore analyzed whether Hijazi's prosecution comported with due process under all three standards. (Doc. 230 at 36–38).

es sufficient conduct of Hijazi himself such that jurisdiction is proper. "An indictment is sufficient if it serves three main functions. It must state the elements of the crime charged, adequately inform the defendant of the nature of the charges, and allow the defendant to plead the judgment as a bar to future prosecutions." *United States v. Singleton*, 588 F.3d 497, 500 (7th Cir.2009). The allegations in the indictment are taken as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir.2009).

The Second Superseding Indictment alleges that Mazon and Hijazi "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait." (Doc. 59 ¶ 1). Hijazi allegedly originally submitted a bid to KBR of about $1.7 million dollars, but then schemed with Mazon to inflate the bid "to ensure that LaNouvelle would be overpaid." (Doc. 59 ¶ 15). "Mazon and Hijazi signed the subcontract, knowing that the subcontract price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of LaNouvelle." (Doc. 59 ¶ 16). The subcontract, Subcontract 39, indicates the United States as "Owner," provides that the United States will undertake various tasks for the performance of the subcontract, and requires that LaNouvelle maintain insurance coverage which included a "waiver of subrogation to the benefit of Brown & Root, Inc. and the U.S. Government." (Doc. 226 §§ 1.2, 1.5, 8.0, 13.0).[10] After signing Subcontract 39, the Indictment alleges that Hijazi and Mazon "caused LaNouvelle to send inflated invoices to KBR ... and to receive payment from KBR on those invoices." (Doc. 59

¶ 17). They also both "caused KBR to submit to the United States Government four invoices for payment for costs KBR incurred in paying the LaNouvelle invoices" which the United States paid on September 15, 16, and 27, and December 17, 2003. (Doc. 59 ¶ 27).

Accordingly, based upon the allegations of the Second Superseding Indictment, Hijazi knowingly schemed to defraud the United States of over $3.5 million, and caused the wires to be used to that effect. As Magistrate Judge Cudmore noted, Hijazi's knowledge that the United States was the ultimate payor on Subcontract 39 is sufficiently alleged in the Second Superseding Indictment, and also supported by the terms of Subcontract 39 itself. (Doc. 233 at 40–44). In the Court's opinion, this is sufficient to establish that Hijazi's actions were intended to have a substantial effect on the United States, namely the theft of millions of dollars from its treasury. *See United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922); *Columba–Colella*, 604 F.2d at 358 (stating that "a state/nation is competent ... to punish one who has successfully defrauded its treasury, no matter where the fraudulent scheme was perpetrated."). Therefore one of the grounds for jurisdiction pursuant to § 402 has been met.

### ii. Reasonableness of Jurisdiction

■ In addition to meeting a basis for jurisdiction pursuant to § 402, in order for Hijazi's prosecution to comport with international law it must also be "reasonable." RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 403(1). Whether jurisdiction is reason-

---

10. In its Opinion, the Seventh Circuit stated that "there could be facts the district court needs to explore" and that "the district court is familiar with the developments in Mazon's prosecution." Accordingly, the Court be-

lieves it is proper to look to the terms of the Subcontract, which is explicitly referenced numerous times in the Indictment (Doc. 59 ¶¶ 16, 17, 23, 25).

able is a context specific inquiry, however § 403(2) of the Restatement provides some relevant factors to consider, including: "(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity ... has substantial, direct, and foreseeable effect upon or in the territory; ... (c) the character of the activity to be regulated; (d) the existence of justified expectations that might be protected or hurt by the regulation; ... (f) the extent to which the regulation is consistent with the traditions of the international system; [and] (g) the extent to which another state may have an interest in regulating the activity." The Magistrate considered these factors and found that the exercise of jurisdiction would be reasonable, and this Court agrees.

While Hijazi argues that the application of United States' laws to him is unreasonable, the Court disagrees. As previously discussed, Hijazi's activity had a substantial, direct, and foreseeable effect upon the United States, i.e. the theft of a substantial amount of money from its treasury. Moreover, the allegations of the Second Superseding Indictment and Subcontract 39 make it plausible that Hijazi knew that his actions were to have such an effect, such that they were not unforeseeable to him. Likewise, the character of the activity to be regulated is of profound importance. The United States has a strong interest in protecting itself from fraud. *See Bowman*, 260 U.S. 94, 43 S.Ct. 39 (1922); *Columba–Colella*, 604 F.2d at 358. This is not a case in which the United States is attempting to prosecute a foreign national for an act taken against a U.S. citizen, or even a U.S. corporation, it is attempting to prosecute Hijazi for actions that were taken against the United States itself. Thus, the concepts of international law that a nation has the right to protect itself from crimes against it surely support jurisdiction here. *See* § 402; 403(2)(f).

Finally, although Hijazi contends that prosecuting him interferes with Kuwait's sovereignty, and Kuwait agrees, the Court does not see how the Government's efforts to protect itself from fraud in any way detracts from Kuwait's sovereignty. This is not a case in which Hijazi acted to defraud Kuwait, or even a Kuwaiti citizen or company, as well as the United States. Hijazi's conduct was directed at defrauding the United States Government, such that Kuwait would have no duty, or even motivation, to prosecute Hijazi therefor. Accordingly, the Court does not find that the Kuwaiti Government's objection to its exercise of jurisdiction renders it unreasonable.

For the foregoing reasons, the Court finds that the exercise of jurisdiction over Hijazi comports with international law, and therefore with due process. The Court will now discuss whether the statutes under which Hijazi has been charged are to apply extraterritorially to his conduct such that jurisdiction is complete.

## II. Extraterritorial Application of the Major Fraud Act and Wire Fraud Statutes

The Second Superseding Indictment charges Hijazi with violations of the Major Fraud Act and the Wire Fraud statute.[11] The Major Fraud Act provides:

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

§ 2. ·

---

11. Hijazi is also charged with aiding and abetting both crimes, in violation of 18 U.S.C.

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any grant, contracts, subcontract ... as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such ... contract, subcontract ..., is $1,000,000 or more shall ... be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

18 U.S.C. § 1031.

The Wire Fraud statute provides for a fine and/or imprisonment for the use of "wire, radio, or television communication in interstate or foreign commerce" in furtherance of a fraudulent scheme. 18 U.S.C. § 1343

As noted above, the Government contends that Mazon and Hijazi schemed to defraud the United States by entering into an inflated subcontract on a prime contract to which the United States was a party. It is undisputed that during the relevant time period, Hijazi, a Lebanese citizen, was in Kuwait and allegedly committed acts in violation of the statutes while in Kuwait. On this point, it is clear that Hijazi had no direct contact with the United States except that he is alleged to have sent three e-mails to Mazon, the last of which (allegedly written in an attempt to cover up the pay-off) was opened in the United States. Thus, the Government is attempting to prosecute Defendant for conduct that ostensibly took place in a foreign country—i.e. extraterritorially.

The Government first argues that this Court need not consider the extraterritoriality of the statutes in question because Mazon's conduct, some of which occurred in the United States, can be imputed to Hijazi. In furtherance of the scheme to defraud the United States, the Government alleges that Mazon e-mailed KBR, an American corporation, regarding the fraudulent subcontract, that he attempted to deposit the kick-back in United States banks, and that he used his United States based e-mail to communicate with Hijazi.

■■■ The Second Superseding Indictment does not allege a conspiracy count. The Seventh Circuit has held, however, that "[i]t is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy." *United States v. Wilson,* 506 F.2d 1252, 1257 (7th Cir.1974). One such doctrine is that co-conspirators can be held accountable for each other's actions. *United States v. Wormick,* 709 F.2d 454, 461 (7th Cir. 1983). Mazon's actions in furtherance of the scheme to defraud can thus be attributed to Hijazi, even though he is a foreign national. *Ford v. United States,* 273 U.S. 593, 622–624, 47 S.Ct. 531, 71 L.Ed. 793 (1927). Thus, the Court finds that because part of the alleged scheme to defraud the United States took place in the United States, Hijazi may be prosecuted here. *See e.g. United States v. Schmucker–Bula,* 609 F.2d 399 (7th Cir.1980) (finding jurisdiction over a foreign national in a drug conspiracy case); *United States v. Leija–Sanchez,* 602 F.3d 797 (7th Cir.2010).

■■■ In any event, the Court will still consider whether the charging statutes have extraterritorial application, as a majority of Hijazi's own conduct occurred overseas. (*See* Doc. 230 at 12–13). Acts of Congress are not presumed to have extraterritorial application. *Small v. United States,* 544 U.S. 385, 389, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005). This presumption may be overcome, however, if there is a clear, contrary, congressional intent to broaden a statute's application to extraterritorial conduct, *see generally, Small,* 544 U.S. at 394, 125 S.Ct. 1752, and if such an application is consistent with international law. *Morrison v. National Australia Bank Ltd.,* —— U.S. ——, 130 S.Ct. 2869,

2878, 177 L.Ed.2d 535 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."); *United States v. Dawn*, 129 F.3d 878, 882 (7th Cir.1997). The text of the statute itself does not mention the extraterritorial reach of the act nor is there any relevant legislative history that would shed light on its reach. *See Middleton v. City of Chicago*, 578 F.3d 655, 658–662 (7th Cir.2009) (noting that courts must first look to the plain language of the statute and then to legislative history to determine congressional intent).

However, neither the lack of clearly expressed language within the statute nor the absence of legislative history may be fatal to this prosecution. An exception to the presumption has been described in *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922). *Bowman* involved a scheme, hatched on the high seas, to defraud the United States in the aftermath of World War I. The case involved a statute that generally made it a crime to defraud the government and that did not expressly state that it applied extraterritorially. The Court noted that such criminal statutes "are not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Id.* at 98, 43 S.Ct. 39.

 Thus,
To limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. *Id.*

The practical result of *Bowman's* holding is that "judges must consider the language and function of the prohibition" in determining the extraterritorial reach of a criminal statute. *Leija–Sanchez*, 602 F.3d at 799. In this instance, the Major Fraud Act was designed to prevent fraud against the United States in the making of contracts in which the United States has an interest. It fits squarely within the exception to the presumption outlined in *Bowman*. The only caveat is that *Bowman* involved United States citizens acting abroad as oppose to a foreign national. The Court nonetheless agrees with the Government that the import of *Bowman* does not hinge on the nationality of the defendant but rather on the particular harm a statute means to prevent: fraud targeted at the United States itself. *See United States v. Delgado–Garcia*, 374 F.3d 1337, 1345–1346 (D.C.Cir.2004); *see also Strassheim v. Daily*, 221 U.S. 280, 284, 31 S.Ct. 558, 55 L.Ed. 735 (1911) (stating with respect to the jurisdiction of states: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."). This same reasoning applies to the wire fraud statute to the extent that it is used to prosecute frauds committed against the United States.

The *Bowman* Court also noted that this exception should only be applied when it fit within "the power and jurisdiction of a government to punish crime under the law of nations." 260 U.S. at 97–98, 43 S.Ct. 39. However, as discussed *supra*, the Court believes that its jurisdiction over Hijazi is consistent with international law such that he may be charged under these statutes. Therefore, the Court agrees with the Magistrate Judge, and finds that the Major Fraud Act and wire fraud statute may be applied extraterritorially to Hijazi's con-

duct. Accordingly, this Court has jurisdiction over Hijazi.

### III. Applicability of the Defense Cooperation Agreement

 In his Motion to Dismiss the Second Superseding Indictment, Hijazi argued that the Defense Cooperation Agreement ("DCA") between the United States and Kuwait bars this Court from exercising criminal jurisdiction over him. The DCA is a classified document such that Hijazi did not have access to its terms. However, he premised his argument on the fact that other "status of forces agreements" ("SOFA") like it, such as the NATO SOFA, would bar such jurisdiction. Hijazi also relied on the statements of the Kuwaiti Government that the DCA bars this Court's jurisdiction. In a formal communication to the Department of Justice on May 3, 2007, Kuwait's Ambassador to the United States stated:

> Upon reviewing the provisions of the Defense Cooperation Agreement (DCA), signed between Kuwait and the United States of America in 1991, we found that it did not grant the United States the right to practice its legal competence (i.e. application of U.S. laws on the citizens of Kuwait or residents in the state of Kuwait, such as in the present case), with respect to acts committed on the territories of the State of Kuwait, except those related to U.S. Army personnel, U.S. civilians and company contractors. (Doc. 180–B).

The Kuwaiti Ambassador reiterated this position in a subsequent letter, in which he stated: "There is nothing in the DCA that would provide any basis for the United States to assert its criminal legal jurisdiction on citizens and residents of Kuwait ..." and that "If the United States desires to exercise its jurisdiction over actions that occur in Kuwait, it can only do so pursuant to the terms set forth in the DCA." (Doc. 180–C). Finally, Hijazi obtained the opinion of Frederick C. Smith, a former career senior executive at the Pentagon who was personally involved in negotiating the DCA, who stated that "the Kuwaiti Government could rightfully consider it a violation of the DCA ... for the United States to assert jurisdiction over a Kuwaiti national or a person ordinarily resident in Kuwait, who is not a member of the U.S. military, for acts occurring wholly or predominantly in Kuwait." (Doc. 180–D).

The Government objects to Hijazi's argument that the DCA bars this Court from asserting jurisdiction over Hijazi. According to the Government, "nothing in the DCA precludes or even discourages this prosecution." (Doc. 217 at 45). The Government argues that, because it is not purporting to exercise jurisdiction over Hijazi pursuant to the DCA, but rather under established principles of U.S. and international law, the DCA is immaterial to this case. In addition, while the Government is unable to comment on any of the actual provisions of the classified document, it notes that the NATO SOFA itself would also not bar jurisdiction in this case because the agreement does not prohibit jurisdiction on traditional grounds, but rather creates a new basis for jurisdiction over certain crimes. (Doc. 217 at 47 n. 11).

Magistrate Judge Cudmore obtained the DCA and engaged in an *in camera* review of the document. While the classified status of the document precluded the Magistrate from going into any detail, after reviewing the document he concluded that "the DCA is completely inapplicable to this criminal cause." (Doc. 230 at 40). Hijazi now argues that the Magistrate gave insufficient deference to the Kuwaiti Government's interpretation of the DCA, and that if the DCA fairly admits of two constructions, the construction favoring Hijazi's

right to be free from prosecution is to be preferred. (Doc. 233 at 41–42).

 While Hijazi is correct that Courts look to the "opinions of our sister signatories" when interpreting a treaty, "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott v. Abbott*, —— U.S. ——, 130 S.Ct. 1983, 1990, 1993, 176 L.Ed.2d 789 (2010). Here, the Court agrees with the Magistrate that nothing in the text of the DCA indicates that it is not applicable to the instant proceedings. Therefore, the Court agrees with the Magistrate's conclusion and finds that the DCA does not bar it from exercising criminal jurisdiction over citizens of Kuwait such as Hijazi, and can be fairly interpreted to grant such jurisdiction in connection with contractual matters such as those underlying his prosecution.[12] While it is foreclosed from discussing the reasons behind its textual interpretation due to the confidential nature of the document, the Court notes that it has taken into account the fact that the Kuwaiti Government strongly objects to Hijazi's prosecution, and its belief that the DCA serves as a bar thereto. Despite these objections, the Court can find nothing in the text of the DCA which would suggest such a reading, and therefore its deference to Kuwait's interpretation is overcome. *See United States v. Alvarez–Machain*, 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."). The Court also notes that the Government is not asserting jurisdiction based upon the DCA, only that the DCA does not bar its otherwise existent jurisdiction to enforce its laws against persons who commit crimes against the nation itself.

### IV. Impact of the Long Pre-trial Delay

Finally, Hijazi makes several arguments that the case against him should be dismissed based upon the length of time that has passed since he was charged. Hijazi's arguments are based upon the Sixth Amendment right to a speedy trial, and Federal Rule of Criminal Procedure 48(b).[13] Magistrate Judge Cudmore considered Hijazi's claims and found them to

12. The Court also recognizes Hijazi's argument that "In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Hijazi believes that the more liberal construction of the DCA would imply that the United States is barred from bringing this action against him. The Court, however, believes the opposite. The fact that the United States signs such SOFA agreements with most nations to which it sends troops suggests that the United States would not, in effect, make those territories zones in which foreign nationals could willingly and knowingly defraud or otherwise commit crimes against the United States without fear of punishment. Thus, as to the contracting parties, the Court believes the more liberal interpretation is the one allowing for jurisdiction.

13. Hijazi first argued that the Second Superseding Indictment should be dismissed pursuant to Rule 48(b) for lack of prosecution in his Motion to Dismiss Second Superseding Indictment. (Doc. 180). He later raised his speedy trial claim in a separately filed motion. (Doc. 174).

be without merit. (Doc. 230 at 45–52). Hijazi has objected to the Magistrate's ruling with respect to both claims,[14] so the Court must now consider them *de novo.*

## A. Sixth Amendment Right to a Speedy Trial

 The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ..." When a defendant raises a claim pursuant to this provision, the Court applies the following four-part test, created by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 519–20, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): (1) whether the delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for that delay; (3) whether, in due course the defendant asserted his right to a speedy trial; and (4) whether he has suffered prejudice as the delay's result. *See also U.S. v. Oriedo,* 498 F.3d 593, 597 (7th Cir.2007). None of these factors are dispositive, however, and the Court must "engage in a difficult and sensitive balancing process" and consider them together with such other circumstances as may be relevant. *Barker,* 407 U.S. at 533, 92 S.Ct. 2182.

 Here, both parties agree that the pre-trial delay in this case, now over six years, is sufficiently long to be presumptively prejudicial such that an analysis of the other three factors is appropriate. *See id.* at 530, 92 S.Ct. 2182 ("Until there is some delay which is presumptively prejudicial, there is no need for inquiry into the other factors that go into the balance.").

Accordingly, the Court must look to these factors, as well as other relevant circumstances, to determine whether Hijazi's Sixth Amendment Right to a speedy trial has been violated.

### i. Blame for the Delay

 The second factor under the *Barker* analysis asks "whether the government or the criminal defendant is more to blame for th[e] delay." *Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). This factor is often the most crucial to the determination of a speedy trial claim. *See United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). Not surprisingly, Hijazi claims that the Government is at fault for not making a serious effort to bring him to trial (Doc. 222 at 41–46); and the Government asserts that the fault lies with Hijazi because he has chosen to remain beyond its reach (Doc. 217 at 49–53). The Magistrate agreed with the Government, and found that Hijazi's choice to remain beyond the reach of the Government, despite the Government's due diligence, indicated that it he was the responsible party. (Doc. 230 at 48 ("A defendant lawfully living in a country with no extradition treaty, who is aware of an indictment against him, can be held responsible for the delay if he chooses to remain beyond that Government's reach.")). In his Objections to the Magistrate's R & R, Hijazi retreats slightly from his stance that the Government should have done more to garner control over him, but nevertheless states that the lack of an extradition treaty between the United States and Kuwait

---

**14.** In finding that Hijazi has objected to the Magistrate's R & R with respect to his lack of prosecution argument, the Court is generously construing Hijazi's Objections. Hijazi makes no substantive arguments with respect to his Rule 48(b) claim, but merely cites to the Rule and directs the Court to the applicable section of his Reply Brief. (Doc. 233 at 52). However, as the Magistrate determined that Hijazi's Rule 48(b) claim was meritless for the same reasons as his Sixth Amendment claim, the Court will look to Hijazi's objections to the Sixth Amendment claim as pertaining to both.

must be viewed as a "neutral" factor, which should be tallied against the Government. (Doc. 233 at 45). In addition, Hijazi claims that the Magistrate erred by using a "fugitive-like" rationale to find that he was the party to blame.

 "A defendant has no duty to bring himself to trial; the [Government] has that duty." *Barker*, 407 U.S. at 527, 92 S.Ct. 2182. This duty exists even if the accused is outside of the United States; in such a case the Government has a duty to seek extradition, unless such an effort would be futile. *See United States v. Walton*, 814 F.2d 376 (7th Cir.1987). As the Seventh Circuit discussed in its Opinion in this case, "[a]lthough the Department of Justice formally asked the Kuwaiti authorities to turn Hijazi over to it, through a diplomatic note dated September 13, 2005, Kuwait has refused to grant that request. All indications in the record continue to support the conclusion that the Government of Kuwait is unwilling to cooperate in this prosecution, insofar as it concerns Hijazi." *In re Hijazi*, 589 F.3d at 405. Moreover, "Hijazi is under no obligation to travel to the United States, and as long as he does not enter the country, he cannot forcibly be brought before the Central District of Illinois ... As we have already noted, there is no extradition treaty between the United States and Kuwait, and so the Kuwaiti government is well within its rights to decide what it wants. to do with Hijazi." *Id.* at 407. The Government has taken several other steps to seek to gain control over Hijazi, including issuing a "red notice" to INTERPOL, however as of this date it has been unsuccessful in its attempts.

Accordingly, the Court must decide the difficult question of who is to blame between a Government that has taken reasonable and diligent steps to secure a defendant for trial which have proved unsuccessful, and a defendant who lawfully and openly remains beyond the Government's control. As the Seventh Circuit recognized, this is not a case in which Hijazi is a fugitive, illegally on the run from the United States Government. *See Hijazi*, 589 F.3d at 412. However, nor does the Court believe it to be a case in which the Government has failed to pursue Hijazi with reasonable diligence. *See Doggett v. United States*, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Case law indicates that in circumstances such as these, the Government cannot be held to blame for the delay, and the factor must be weighed in its favor. *See United States v. Ocampo*, 266 Fed.Appx. 63, 65 (2d Cir. 2008) (holding that the second factor weighed heavily in favor of the government when it was unable to extradite a defendant but took efforts to ensure his arrest upon entry to the United States); *United States v. Corona–Verbera*, 509 F.3d 1105, 1115–16 (9th Cir.2007) (holding second factor weighed against dismissal when delay was based upon the futility of extradition and the government took steps to arrest defendant upon entry to United States); *United States v. Tchibassa*, 452 F.3d 918, 926 (D.C.Cir. 2006) (holding that second factor weighed against defendant where the delay in his arrest was attributable primarily to his continued residence in an area over which the United States had no control and little influence); *see also United States v. Reumayr*, 530 F.Supp.2d 1200, 1206 (D.N.M.2007) (stating that "courts have uniformly held the defendant, rather than the government, liable for delay caused by extradition proceedings or by other attempts to remain outside the United States," and finding that whether or not defendant was a fugitive was ir-

relevant to such consideration.).[15]

The Court agrees with these authorities, and with the thoughtful opinion of Magistrate Judge Cudmore. While it is Hijazi's right to remain in Kuwait, and the Kuwaiti Government's right to choose not to deliver him to the United States, this cannot be weighed against the Government in determining why Hijazi has not yet been brought to trial. The Government has acted diligently in seeking to obtain him and has therefore fulfilled its duty. Therefore, the factor is to be weighed in favor of the Government and against dismissal.

### ii. Assertion of Right

■■■ The next factor for the Court to consider is whether Hijazi asserted his right to a speedy trial in due course. *Barker*, 407 U.S. at 520, 92 S.Ct. 2182. "The Supreme Court explicitly has made the quality of the defendant's assertion of the right not just a factor in the analysis, but one entitled to significant weight and one without which the claim will be difficult to prove." *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir.2007). The Government argues that Hijazi has not validly asserted his right because, rather

than appear in the United States to stand trial, he has "vigorously moved to dismiss the indictment from overseas and has steadfastly refused to subject himself to U.S. jurisdiction." (Doc. 217 at 54). The Magistrate agreed, finding that while Hijazi's motion to dismiss based on speedy trial concerns constituted an assertion of his right, the assertion is hollow because Hijazi refuses to appear for trial and the Government cannot compel his appearance. (Doc. 230 at 49). In his Objections, Hijazi argues that he has not forfeited his right to a speedy trial simply because he resides overseas, nor is he required to give the Court jurisdiction over his person in order to claim a Sixth Amendment violation. (Doc. 233 at 45–56).[16]

It is not disputed that Hijazi first noted his intention to assert his right to a speedy trial on December 21, 2007, in his Motion to Dismiss Second Superseding Indictment (Doc. 180 at 30 n. 6), where he indicated that he would be asserting his right to a speedy trial in this matter. Nine months later, on September 3, 2008, Hijazi filed a formal Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial. (Doc. 174). The question, therefore, is not whether his assertion of his right was

---

**15.** Hijazi argues that cases such as these are not relevant to the instant proceedings because they all entailed defendants who were fugitives from the United States, while he is not. (Doc. 233 at 45–58). However, even if all of these cases involved fugitive defendants (which they do not), none of the courts rely on the status of the defendant in determining the weight to be given to the cause for delay factor. Instead, the courts examine the conduct of the government, and if such conduct is reasonable and diligent, conclude that the factor must be weighed in its favor.

**16.** Hijazi also argues that *Klopfer v. State of North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) mandates dismissal of the indictment because "an indictment left pending indefinitely constitutes a Sixth Amend-

ment violation." (Doc. 233 at 49). Hijazi attributes this quote as a holding of the Seventh Circuit, however the quoted language comes only from that court's parenthetical regarding the holding of *Klopfer*. The Court agrees with the Magistrate that *Klopfer* is not controlling here (an issue the Seventh Circuit had no need to consider), because in this case Hijazi is not powerless to move the case along, as was the defendant there. *See Klopfer*, 386 U.S. at 216, 87 S.Ct. 988 (discussing the fact that, the current procedural posture of the case against Klopfer left him "no means by which he can obtain a dismissal or have the case restored to the calendar for trial."). Hijazi's indictment will no longer be pending against him should he choose to come to trial.

timely, but instead whether it is meaningful, in light of the fact that the cause for delay in trial is his refusal to come to court.

Hijazi cites to two cases for the proposition that a non-fugitive defendant who resides overseas does not forfeit his right to demand speedy trial. (Doc. 233 at 48). However, in both of those cases, the reason that the defendants had not been tried earlier was due to the government's negligence in locating them or informing them of the charges pending against them. *See United States v. Judge*, 425 F.Supp. 499 (D.Mass.1976) (finding that the Government unnecessarily delayed bringing the defendant to trial when it knew of the defendant's whereabouts overseas and made no effort to inform him that he was under indictment or bring him to trial); *United States v. McDonald*, 172 F.Supp.2d 941, 949–50 (W.D.Mich.2001) (finding that the delay in trial was attributable to the Government not promptly seeking extradition, and that defendant had actually sought to negotiate his return to the United States on more than one occasion). Here, the Court has already determined that the Government is not to blame for the delay in bringing Hijazi to trial. Moreover, the Government points the Court to *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir.1995), a case in which the Ninth Circuit held that when a defendant could have avoided post-indictment delay by returning to the United States, he could not then complain of the delay that he himself had caused.

The Court finds the *Manning* rationale and the rationale of the Magistrate to be convincing. If Hijazi truly wants a speedy trial, and desires to assert his right thereto, he cannot at the same time refuse to show up for it. Accordingly, the Court agrees with the Magistrate that Hijazi's assertion of his Sixth Amendment right is "hollow" and without merit, and thus this factor also weighs in favor of the Government.

### iii. Prejudice

 The final factor to be considered is whether Hijazi has suffered prejudice as a result of the delay in bringing him to trial. *Barker*, 407 U.S. at 519–20, 92 S.Ct. 2182. When the Government pursues a defendant with reasonable diligence, and is therefore not to blame for the delay, the defendant must "show specific prejudice to his defense." *Doggett v. United States*, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ("if the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense."); *see also Manning*, 56 F.3d at 1194–95 ("Whether [defendant] must show actual prejudice depends on whether it is he or the government who is responsible for the delay.").

Hijazi argues that he has suffered the requisite prejudice to have his case dismissed. He relies on the "litany of substantial hardships contained in the Seventh Circuit's decision," as well as the potential prejudice to his defense. (Doc. 233 at 51–52). In its Opinion, the Seventh Circuit did state, as Hijazi quotes, that the continued indictment over him would "make it very risky for him to ever leave Kuwait, which is not his native country...." *In re Hijazi*, 589 F.3d at 413. However, this was couched in terms of the risk Hijazi faced if the Court denied his motions to dismiss, and not in terms of Sixth Amendment prejudice. *See id.* (Preceding the above quote with, "[w]e think that the district court took too narrow a view of the

adverse consequences Hijazi would suffer if he loses on his motions to dismiss."). Moreover, when the Seventh Circuit discussed the prejudice to him earlier in its Opinion, this was in terms of whether this Court should rule upon his motions to dismiss and determine whether it had the authority to command his appearance, and not upon whether the indictment should actually be dismissed. *Id.* at 407. Accordingly, the Seventh Circuit's opinion as to the prejudice being suffered by Hijazi is not binding upon this Court's determination of whether the indictments should be dismissed pursuant to the Sixth Amendment. *See id.* at 410 ("we express no view about the arguments Hijazi has presented based on the Sixth Amendment guarantee of a speedy trial.").

The Court does not dispute that Hijazi may be suffering personal prejudice as a result of the indictments hanging over him. However, as the Supreme Court stated in *Doggett,* because the delay is not due to the Government's negligence or bad faith, Hijazi must show "specific prejudice to his defense." 505 U.S. at 656, 112 S.Ct. 2686. Hijazi has not done so. While he states that the delay is "likely to have prejudiced" his defense, he relies only upon the presumption of prejudice established by courts when a lengthy delay is caused by the Government. Such potential prejudice is insufficient when the delay is of Hijazi's making. While Hijazi argues that it may be difficult to secure witnesses for trial because they live overseas, this issue would arise regardless of the date of Hijazi's trial. (Doc. 222 at 50). Moreover, as the Government has pointed out, court records have already been established as to much of the witness' testimony via the trial of his co-defendant, and therefore witnesses could not rely on a "lack of memory" if the case was brought to trial.

In sum, the Court does not find that Hijazi has suffered enough prejudice to overcome the fact that the delay is of his own making. Accordingly, the Court agrees with the Magistrate's assessment of Hijazi's Sixth Amendment claim, and DENIES Hijazi's Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174).

## B. Federal Rule of Criminal Procedure 48(b)

 Hijazi has also sought to have the indictments against him dismissed for lack of prosecution, pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure. Rule 48(b) provides: "The court may dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." The Rule "is a restatement of the inherent power of the court to dismiss a case for want of prosecution," and that power is not circumscribed by the Sixth Amendment. *United States v. Clay,* 481 F.2d 133, 135 (7th Cir.1973). Still, Rule 48(b) is driven by the "same general considerations as the Sixth Amendment," and dismissal is appropriate only where there is delay that is purposeful or oppressive. *United States v. Ward,* 211 F.3d 356, 362 (7th Cir.2000).

 The Magistrate found that Hijazi's Rule 48(b) claim was without merit because the delay here is "attributable to Hijazi's choice to remain beyond the Government's reach." (Doc. 230 at 51). While the Magistrate acknowledged that this was a lawful choice for Hijazi to make, he noted that such choice was not without consequences—that is, the delay in his trial. (Doc. 230 at 51). Hijazi has not made any objections specific to his Rule 48(b) claim, but merely seeks to incorporate his objections to his speedy trial claim thereto. (Doc. 233 at 52). Accordingly, for the

same reasons the Court has denied his request to dismiss for lack of speedy trial, the Court also finds Hijazi's claims of lack of prosecution to be without merit.

## CONCLUSION

For the foregoing reasons, the Report and Recommendation of Magistrate Judge Cudmore (Doc. 230) is AFFIRMED, and Hijazi's Motion to Dismiss Indictment (Doc. 15) Motion to Dismiss Second Superseding Indictment (Doc. 131) and Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174) are DENIED. IT IS SO ORDERED.

## *REPORT AND RECOMMENDATION*

BYRON G. CUDMORE, United States Magistrate Judge:

This case is before the Court for a Report and Recommendation on Defendant's motions to dismiss (d/es 15, 131, 174) the indictment against him. For the reasons below, the Court recommends that the motions be denied.

**Background**

On March 16, 2005, the U.S. Government ("Government") charged Defendant Ali Hijazi ("Hijazi") and Jeff Mazon ("Mazon") with counts under the Major Fraud Act, 18 U.S.C. § 1031(a), the wire fraud statute, 18 U.S.C. § 1343, and the aiding and abetting statute, 18 U.S.C. § 2. A superseding indictment was filed August 3, 2006. (d/e 59).

The superseding indictment alleges that Hijazi and Mazon "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait." (d/e 59, ¶ 1). In particular, the U.S. Army Operations Support Command entered into a prime contract with Kellogg Brown and Root Services, Inc. ("KBR"), to pro-

vide property and services to the U.S. military throughout the world. *Id.* ¶ 7. One of KBR's tasks was to provide for the storage and dispensation of fuel at an airport in Kuwait used by the U.S. military. *Id.* ¶ 11. KBR estimated the cost of this task at $685,080. *Id.* ¶ 20. To accomplish the task, KBR, through Mazon (its procurement employee), solicited bids from Kuwaiti companies. Mazon was stationed in Kuwait and responsible for negotiating, executing and administering subcontracts under the prime contract.

Hijazi is a resident of Kuwait and was the managing partner of LaNouvelle General Trading and Contracting Co., a Kuwaiti company ("LaNouvelle"). Hijazi, through LaNouvelle, submitted a bid to Mazon of about $1,673,100. A different company submitted a bid for about $1,891,890. *Id.* ¶ 21. Upon receiving the bids, Mazon allegedly inflated both bids, raising LaNouvelle's bid to over 5½ million dollars, and raising the other company's bid to over 6.2 million dollars. *Id.* ¶ 22. LaNouvelle's inflated bid was more than $4.8 million more than KBR's estimate for the work, and more than $3.8 million more than its original bid.

Mazon picked LaNouvelle's "lower" bid, awarding the subcontract to LaNouvelle in February 2003, for approximately $5½ million. "Mazon and Hijazi signed the subcontract, knowing that the subcontract price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of LaNouvelle." *Id.* ¶ 16.

"From in or about March 2003 through in or about August 2003, Mazon and Hijazi caused LaNouvelle to submit six different invoices to KBR for payment under the" inflated subcontract. *Id.* ¶ 27. Mazon and Hijazi then allegedly caused KBR to send four invoices to the Government, and the

Government paid those invoices in September and December 2003. *Id.* ¶ 27.[1]

"In or about September 2003, Hijazi gave a $1 million draft to Mazon in exchange for Mazon's favorable treatment of LaNouvelle. Mazon and Hijazi also executed a promissory note as a ruse to make the $1 million payment appear to be a $1 million loan from Hijazi to Mazon." *Id.* ¶ 28. Hijazi sent an e-mail to Mazon's employee account on September 24, 2003, characterizing "this whole lown [sic] (principal and interest) as totally your money...." *Id.* ¶ 29. On or about October 1, 2003, Mazon allegedly tried unsuccessfully to deposit the money in a U.S. bank. *Id.* ¶ 30. On October 9, 2003, Hijazi sent an e-mail to Mazon's personal account, imparting advice on how to deposit the funds: Hijazi allegedly told Mazon to open three different offshore accounts and deposit about $300,000 in each, stating that the money was from "consultancy work, business assoicates [sic], salaries abd [sic] bonuses, or any other reasoning." *Id.* ¶ 31. Later that month, Mazon tried again to deposit the money in a U.S. financial institution, but the indictment is silent on whether that attempt was successful. *Id.* ¶ 32.

In November 2003, a KBR investigator questioned Hijazi about the subcontract. *Id.* ¶ 33. The next day Hijazi sent an e-mail to Mazon's personal account stating, "Please when you call your ex-friends in kuwait [sic] please be very carreful [sic] on what you say." *Id.* ¶ 33.

The superseding indictment, filed in August 2006, charges Hijazi and Mazon with scheming to defraud the U.S. Government, in violation of the Major Fraud Act, 18 U.S.C. § 1031, and with wire fraud based on the same scheme, 18 U.S.C. §§ 2, 1343. The U.S. payments to KBR form the basis for four counts under the Major Fraud Act. Mazon's four e-mails to and from KBR relating to the subcontract, and two wires directing payment to KBR form the basis for the five counts of wire fraud.

Mazon has been tried twice on these charges, each time the jury was unable to reach a verdict. (d/e 217, p. 2). In March 2009, the Government reached a plea agreement with Mazon. Mazon pleaded guilty to a misdemeanor count for making a writing containing a false statement, and in return all the fraud charges against him were dropped. *U.S. v. Mazon,* 05–cr–40024 (C.D.Ill., Judge McDade, plea agreement, d/e 210). In the plea agreement, Mazon stipulated that he had created a "memorandum of record" for the KBR subcontract file which falsely stated that Mazon had obtained approval from the project manager when, in fact, Mazon had "knowingly and intentionally failed to inform. [the project manager] that the amount of Subcontract 39 was nearly five million U.S. Dollars higher than the original KBR estimate." *Id.* ¶ 14. None of the original fraud allegations in the indictment were included in the stipulation, and the agreement does not require Mazon to testify against Hijazi.

Despite its inability to convict Mazon, the Government continues to pursue Hijazi's prosecution. Hijazi's prosecution, however, is at a standstill because the Government has been unable to obtain his appearance in the U.S. Hijazi remains in Kuwait, which has no extradition treaty with the U.S. Hijazi did voluntarily surrender himself to the authorities in Kuwait in April 2005, but he was released and posted

---

1. The indictment is silent as to whether the U.S. actually paid the entire $5.5 million to KBR. Hijazi contends that no "lasting financial loss" was suffered because KBR " 're-versed' the charges relating to the subcontract after 'discovering' the alleged fraud." (d/e 222, p. 21 n. 9).

bond was returned to him. (d/e 133, p. 2). That same month, the U.S. directed the International Criminal Police Organization (INTERPOL) to issue a "red notice" on Hijazi, which "calls on member nations to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the U.S." (d/e 217, p. 48). Several months later, in September 2005, the U.S. Government made a formal request to the Kuwaiti Government to turn over Hijazi, but Kuwait, through its Ambassador, refused and instead demanded that the charges against Hijazi be dropped. Kuwait has requested in writing at least four times that the U.S. drop the charges against Hijazi, arguing that the U.S. has no jurisdiction to prosecute Hijazi for conduct which occurred entirely in Kuwait. (d/e 180–1, Appendix B & C, letters from Kuwait Ambassador to Deputy Assistant Attorney General; d/e 161–1, Ex. A (same); d/e 33 in 7th Circuit Appeals case 08–3060 (communication from Kuwait's Minister of Justice)).

After the indictment, Hijazi hired U.S. counsel and filed motions to dismiss the indictment. The District Court declined to rule on those motions until Hijazi appeared before the Court for arraignment. Hijazi then filed a petition for mandamus with the Seventh Circuit Court of Appeals, seeking a ruling on the motions. The Court of Appeals granted the petition on December 11, 2009, directing the District Court to rule on Hijazi's motions to dismiss. U.S. District Judge McDade referred the motions to the undersigned on December 17, 2009. Supplemental briefs at the District Court level pursuant to the order of the undersigned were filed February 1, 2010 (d/e 217) and March 19, 2010 (d/e 222). Supplemental issues were addressed by the parties as ordered by the Court (see d/es 223 through 228) with the last filing on April 29, 2010. The motions are now fully briefed. The case is now before this Court for a recommendation on those motions.

## Analysis

**I. Hijazi's alleged role in the scheme to defraud the U.S. is enough to permit his criminal prosecution in the U.S. His prosecution is permissible because part of the scheme to defraud the U.S. took place in the U.S., and, in any event, the scheme was intended to and did produce injury to the U.S.**

**A. Hijazi's role in the scheme should not be viewed in isolation.**

Hijazi contends that all of his alleged conduct took place in Kuwait, outside the reaches of U.S. criminal law. It is undisputed that Hijazi is a resident of Kuwait, a citizen of Lebanon, and his only trip to the U.S. occurred in 1993. (d/e 222, p. 3). The Government also does not dispute that La-Nouvelle is a Kuwaiti company, and that the U.S. was not a party to the subcontract between KBR (a U.S. Company) and La-Nouvelle. *Id.*

Hijazi did send three electronic mails ("e-mails") to Mazon's e-mail accounts, which the Government maintains were "located in the United States." (Superseding indictment, d/e 59, ¶¶ 29, 31). Mazon opened two of those e-mails in Greece, and one of the e-mails in the U.S.

The U.S. argues that it is not necessary to decide whether those e-mails alone were enough to allow criminal prosecution of Hijazi, because all the acts taken in furtherance of the scheme to defraud are relevant, including those taken by Mazon in the U.S. and the wire payments by the U.S. Government to KBR. In support of this argument, the U.S. cites cases holding that an overt act in the U.S. to further a criminal conspiracy is enough to prosecute all co-conspirators, even those who did not

take action in the U.S. *See, e.g., Ford v. U.S.*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927)(allowing criminal prosecution of British citizens for conspiracy to import liquor where overt acts were taken in U.S. in furtherance of conspiracy); *U.S. v. Schmucker–Bula*, 609 F.2d 399, 402 (7th Cir.1980)(co-conspirator's mailing of cocaine to Chicago enough to establish criminal jurisdiction over defendant, even though defendant himself took no actions directed at U.S.); *U.S. v. Inco Bank & Trust Corp.*, 845 F.2d 919 (11th Cir.1988) (Cayman bank could be criminally prosecuted for money laundering, even though bank took no overt actions in U.S., where conspiracy occurred partly in U.S.). These cases upheld the prosecutions without relying on extraterritorial principles.

The Court agrees with the Government. Hijazi's conduct should not be viewed in isolation, but instead in context of the overall scheme to defraud the U.S. Government, part of which indisputably occurred in the U.S.[2] The indictment alleges that Hijazi and Mazon, in a scheme to defraud the U.S., signed a subcontract with inflated prices, "caused LaNouvelle to send inflated invoices to KBR ... and to receive payment from KBR," "caused KBR to submit inflated invoices to the United States Government," and, "caused the United States Government to pay the inflated invoices submitted by KBR." (d/e 59 ¶¶ 16–18). The U.S. payments and Ma-

zon's e-mails were a part of that scheme, attributable to Hijazi because he was allegedly a participant in the scheme. Whether those allegations can be proven beyond a reasonable doubt is subject to speculation, but the allegations are clearly sufficient to allow Hijazi's prosecution.

The fact that Hijazi was not formally charged with conspiracy does not detract from the allegations that Hijazi schemed with Mazon to submit a fraudulent bid to KBR, with the ultimate purpose of passing those fraudulent charges on to the U.S. Government. *See U.S. v. Dick*, 744 F.2d 546, 552 (7th Cir.1984)(defendant can be held accountable for mailings of a different defendant in scheme to defraud, " 'whether or not he knew of or agreed to any specific mailing.' ")(no separate conspiracy count) (citation omitted).; *U.S. v. Wormick*, 709 F.2d 454, 461 (7th Cir.1983)(defendant's actions in mail fraud scheme should not be viewed "in isolation, ... [but] examine[d] ... in the context of the scheme as a whole"); *U.S. v. Wilson*, 506 F.2d 1252, 1257 (7th Cir.1974)("It is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy."); *U.S. v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir.2002)("knowing participant in a scheme to defraud is vicariously liable for substantive acts of mail fraud or wire fraud committed by co-schemers."); *U.S. v. Black*, 469 F.Supp.2d 513, 536

---

**2.** Since the Government does not make the argument, the Court makes no recommendation regarding whether these three e-mails, standing alone without reference to the overall scheme to defraud, are sufficient U.S. contacts to permit Hijazi's prosecution. The Court does point out, however, that Mazon did open one of those e-mails in the U.S., and, in any event, Hijazi arguably should have reasonably foreseen that sending an e-mail to a U.S. citizen's work or personal account was likely to involve contacts in or with the U.S., regardless of where the e-mail was opened.

The Court also believes, contrary to Hijazi's arguments, that the e-mails did "advance the alleged fraud" (d/e 215, Ex. 1 p. 23) because they coordinated the $1 million alleged kick back and created inferences of attempts to cover up. *See U.S. v. Lanas*, 324 F.3d 894, 902 (7th Cir.2003); *U.S. v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir.1994)("Communications which occur after the defendant has obtained the victims' money or property are in furtherance of the fraudulent scheme if they facilitate concealment or postpone investigation of the scheme.").

(N.D.Ill.2006)(" 'evidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy' ")(quoted cite omitted). Hijazi's actions are properly viewed as an important part of the overall scheme to defraud hatched by both Hijazi and Mazon, some of which indisputably occurred in the U.S. Without Hijazi's agreement to sign the subcontract with inflated prices and submit inflated invoices to KBR, the scheme could not have occurred.

**B. The Major Fraud Act and the wire fraud statute apply extraterritorially to Hijazi.**

The Government contends that the Court need not address extraterritorial reach because part of the scheme occurred in the U.S. Some of the cases cited by the Government support this conclusion, but others engage in an extraterritorial analysis even where part of the acts occurred in the U.S. *Compare U.S. v. Inco Bank & Trust Corp.*, 845 F.2d 919, 920 n. 4 (11th Cir.1988)(citing with approval article concluding that "a conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction"); *U.S. v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1130 (D.C.Cir.2009)(foreign conspiracy to deceive Americans about smoking was prosecutable under RICO; court need not address extraterritoriality since conduct had "substantial domestic effect"); *with U.S. v. Leija–Sanchez*, 602 F.3d 797, 800–01 (7th Cir.2010)(discussing both co-conspirator and extraterritorial concepts, even though substantial part of acts occurred in U.S.); *U.S. v. MacAllister*, 160 F.3d 1304 (11th Cir.1998)(addressing extraterritorial application even though significant actions taken in U.S.); *U.S. v. Reumayr*, 530 F.Supp.2d 1210 (D.N.M.2008)(same). Additionally, as the Seventh Circuit recognized in *Leija–Sanchez*, 602 F.3d 797, 800–01 (7th Cir.2010), the Supreme Court case of *Bowman, infra*, "thought that there was a question about extraterritorial application because *some* of the elements occurred ..." outside the U.S., even though at least one element (the U.S. overpayment) had occurred in the U.S. (emphasis in original). Application of the criminal statutes to Hijazi might therefore be considered "extraterritorial" even though part of the scheme occurred in the U.S. *See Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C.Cir. 1993)("By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders."). Accordingly, the Court believes it is necessary to analyze the extraterritorial reach of the Major Fraud Act and the wire fraud statute.

### 1) Statutory Construction of the Major Fraud Act

Congress has the power to apply its laws outside the U.S., if consistent with international law. *U.S. v. Dawn*, 129 F.3d 878 (7th Cir.1997). The first task, then, is to determine whether Congress intended for the Major Fraud Act and wire fraud statute to apply extraterritorially. If so, the Court then considers whether such application is consistent with international law.

18 U.S.C. § 1031 states in pertinent part:

**§ 1031. Major fraud against the United States**

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any grant, contract, subcontract,

..., or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, ... is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

This statute does not expressly address whether it applies to frauds against the U.S. which are executed from outside the U.S., nor do the parties point to any relevant legislative history. The term "whoever" in statute does not point one way or the other. *See Small v. U.S.*, 544 U.S. 385, 388, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005)(term "any court" in criminal statute does not answer whether Congress meant to include foreign courts).

" '[I]t is a longstanding principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." ' " *Dawn*, 129 F.3d at 882 (citations omitted). Congress knows how to expressly provide for the extraterritorial reach of a statute, and has done so expressly in other statutes. *See, e.g., U.S. v. Black*, 469 F.Supp.2d at 544 (18 U.S.C. § 1512(h) (obstruction of official proceedings) expressly states that it applies extraterritorially); Hijazi Memorandum, d/e 180 p. 12 n. 1 (citing examples). However, "[w]e normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co., Inc. v. Reynolds*, — U.S. ——, 130 S.Ct. 1784, 1788, 176 L.Ed.2d 582 (2010).

There is a category of statutes where the presumption either does not apply or is rebutted, even if the statute is silent. Broadly described, these are statutes designed to protect the U.S. from injury, applied in situations where injury to the U.S. either occurs or is likely to occur. This exception to the presumption against extraterritoriality was described in *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), in which the Supreme Court addressed the extraterritorial reach of a criminal statute prohibiting a conspiracy to defraud a corporation in which the Government was a shareholder. The defendants in *Bowman* hatched a plot to bill the U.S. government for fuel that was never ordered. The plot was hatched while on the high seas or in foreign ports; three of the conspirators were Americans, the fourth from Britain. The three Americans were caught and charged, but the British defendant eluded capture. 260 U.S. at 95, 43 S.Ct. 39.

The American defendants in *Bowman* moved to dismiss the indictment on the ground that the crime had not been committed within the U.S., and was therefore outside the reach of the criminal fraud statute. The Supreme Court disagreed, concluding that the criminal statute did apply to the three American citizens:

We have in this case a question of statutory construction. The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government

where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.... But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense....

260 U.S. at 98, 43 S.Ct. 39.

Thus, *Bowman* acknowledged the presumption against extraterritorial application, but concluded that the presumption did not apply "to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdic-

tion, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Id.* In these situations, *Bowman* teaches that extraterritorial application can be inferred, even if the statute does not expressly address the issue.[3] *See U.S. v. Corey,* 232 F.3d 1166, 1170 (7th Cir.2000)("The territorial presumption is thus based on the common-sense inference that, where Congress does not indicate otherwise, legislation dealing with domestic matters is not meant to extend beyond the nation's borders. But the presumption *does not* apply where the legislation implicates concerns that are not inherently domestic.... Thus, courts do not apply the territorial presumption where it is not a reliable guide to congressional intent.").

If Hijazi was an American citizen, *Bowman* would be dispositive. *Bowman,* however, specifically declined to address whether the British conspirator could be prosecuted:

The three defendants who were found in New York were citizens of the United States, and were certainly subject to such laws as it might pass to protect itself and its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government to which they owe allegiance. The other defendant is a subject of Great Britain. He has never been apprehended, and it will be time enough to consider what, if any, jurisdiction the District Court below has

3. *See U.S. v. Dawn,* 129 F.3d 878, 882 n. 7 (7th Cir.1997)("*Bowman* recognizes an exception to the presumption against extraterritorial intent"); *United States v. Gatlin,* 216 F.3d 207, 211 n. 5 (2d Cir.2000)("Statutes prohibiting crimes against the United States government may be applied extraterritorially even in

the absence of 'clear evidence' that Congress so intended.")(emphasis in original)(citing *Bowman* ) (disagreed with on other grounds by *U.S. v. Corey,* 232 F.3d 1166, 1172–73 (9th Cir.2000)). While these cases did not involve foreign defendants, their interpretation of *Bowman* is still instructive.

to punish him when he is brought to trial.

260 U.S. at 103, 43 S.Ct. 39.

The question then is whether *Bowman's* reasoning can be extended to apply to non-U.S. citizens. Case law suggests that it can and has. For example, in *U.S. v. Nippon Paper Industries Co., Ltd.,* 109 F.3d 1 (1st Cir.1997), the First Circuit held that the U.S. could prosecute a Japanese corporation under the Sherman Act for price fixing paper ultimately sold in the U.S. The Japanese corporation allegedly schemed to sell paper to "unaffiliated trading houses [in Japan] on condition that the latter charge specified (inflated) prices for the paper when they resold it in North America." *Id.* The Court acknowledged the presumption against extraterritorial application, 109 F.3d at 3, but concluded based on its review of precedent that this presumption either did not apply or was overcome because the criminal conduct was intended to and did cause injury in the U.S. *Id.* at 3–4 (*citing Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)) (civil antitrust claim allowed although actions occurred in Britain because the conduct "was meant to produce and did in fact produce some substantial effect in the United States."); *see also Hoffmann–La Roche Ltd.,* 542 U.S. 155, 165, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (antitrust laws did not apply to foreign conduct where harm caused was solely foreign, but recognizing that antitrust laws do apply to foreign conduct where injury is domestic).

Cases cited by the Government have reached the same conclusion for criminal conduct by a foreign citizen in a foreign country which produces injury in or to the U.S. *U.S. v. Benitez,* 741 F.2d 1312, 1316 (11th Cir.1984)(Columbian citizen could be prosecuted in U.S. for stealing from DEA agents, assaulting them and conspiring to murder them, even though all acts occurred outside U.S.—"Under the protective principle, the crime certainly had a potentially adverse effect upon the security or governmental functions of the nation."); *U.S. v. Felix–Gutierrez,* 940 F.2d 1200, 1204 and n. 3 (9th Cir.1991)(defendant, who was not a U.S. citizen, could be prosecuted in U.S. for accessory after the fact to kidnapping, torturing and murder of DEA agents in Mexico)(recognizing *Bowman's* exception to presumption against extraterritorial application where statute was enacted to enable Government to protect itself); *U.S. v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1130 (D.C.Cir.2009)(where foreign conduct has "substantial domestic effects [which] implicates a state's legitimate interest in protecting its citizens within its borders," presumption against extraterritoriality does not apply)(British company could be prosecuted under RICO for scheme to misrepresent health effects of smoking where scheme had substantial detrimental effects in U.S.); *U.S. v. Delgado–Garcia,* 374 F.3d 1337 (D.C.Cir.2004)(criminal statutes regarding bringing illegal aliens into U.S. applied extraterritorially to non-U.S. citizens who conspired to transport aliens from Ecuador to Mexico, where the aliens could enter the U.S.)("On its face, [the criminal statute] concerns much more than merely 'domestic conditions.' It protects the borders of the United States against illegal immigration.")(Judge Rogers, dissenting).

 The Court believes that these cases, though they may differ in their analysis, can be distilled to one idea: if a statute is silent, extraterritorially application will nevertheless be inferred if the conduct proscribed causes or is likely cause significant injury to the U.S.[4] That

4. Hijazi cites *United States v. Yakou,* 393 F.3d 231, 243 (D.C.Cir.2005), republished at 428

injury or intended injury to the U.S. is what also justifies extraterritorial application under international law principles. *See discussion infra.*

Hijazi questions whether *Bowman* remains viable in light of several later Supreme Court cases addressing the extraterritorial reach of statutes. After briefing in this case, however, the Seventh Circuit affirmed *Bowman's* continued vitality in *U.S. v. Leija–Sanchez,* 602 F.3d 797 (7th Cir.2010)("The Supreme Court has neither overruled *Bowman* nor suggested that the courts of appeals are free to reconsider its conclusion."). *Bowman,* therefore, remains good law.

Hijazi attempts to limit *Bowman* to "crimes that as a practical matter will typically involve foreign conduct" such as illegal drug trafficking, immigration, terrorism and violence against DEA agents. (Hijazi's Seventh Circuit Supplemental Brief, d/e 215, p. 18). *Bowman,* though, involved none of these crimes, but instead involved fraudulent overbilling of the U.S., the same kind of crime at issue herein. The Major Fraud Act is directed at schemes to obtain money under false pretenses in contracts and subcontracts where the U.S. is prime contractor—that is what Hijazi allegedly did by intentionally inflating his subcontract. As this case demonstrates, U.S. military efforts abroad can require large sums of money spent on prime contracts and subcontracts throughout the world. The need to protect the U.S. against fraud in these contracts is not an inherently domestic need, but extends globally to wherever those contracts are

performed. The potential for fraud is present regardless of the nationality of the subcontractors or the location of the work provided. *Bowman* recognized this: "[t]he statute in Bowman was designed to prevent fraud by military contractors during the aftermath of World War I. The Justices observed that, because military operations in that war took place throughout the world, the statute must reach frauds hatched abroad." *United States v. Leija–Sanchez,* 602 F.3d 797, 799 (7th Cir. 2010). The reasoning is equally persuasive here. Restricting the Major Fraud Act to domestic acts or to U.S. citizens "would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds...." *Bowman,* 260 U.S. at 98, 43 S.Ct. 39. In the Court's opinion, the Major Fraud Act, like the criminal statute in *Bowman,* is "not logically dependent on [its] locality for the government's jurisdiction, but [is] enacted because of the right of the government to defend itself against obstruction, or fraud, wherever perpetrated...." 260 U.S. at 98, 43 S.Ct. 39. Under *Bowman,* the Major Fraud Act does not need an express statement by Congress that it applies extraterritorially—its extraterritorial application is "inferred from the nature of the offense." *Id.*

Unlike the cases cited by Hijazi, the Court sees nothing in the context, structure, or text of Major Fraud Act to suggest that it applies only domestically. *Compare with Small v. U.S.,* 544 U.S. 385, 391, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005)(borrowing from rationale behind

F.3d 241 (D.C.Cir.2005), for the proposition that the presumption applies in the criminal statute context as well as the civil. It is true that the presumption can apply in the criminal context, but the court in *Yakou* found that the underlying criminal statute expressly applied only to "U.S. citizens." 393 F.3d at

243. Relying on the presumption, the court then held that the aiding and abetting statute could not apply extraterritorially to a foreign citizen because the underlying criminal statute did not apply extraterritorially. 393 F.3d at 242.

presumption to conclude that felon-in-possession statute referencing convictions "in any court" did not include foreign courts, in part because "foreign convictions differ from domestic convictions in important ways" and including foreign convictions would produce anomalies and inconsistencies within statute); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 170–174, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)(statute limiting Attorney General's authority to deport or return aliens did not preclude executive order directing the Coast Guard to interdict Haitian immigrants on open seas and repatriate without determining refugee status; text of statute referred only to Attorney General's domestic institution of deportation/return proceedings); *Smith v. U.S.*, 507 U.S. 197, 201–02, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993)(Antarctica was "foreign country" within foreign country exception to waiver of immunity in Federal Tort Claims Act; construing ordinary meaning of word country and pointing out anomalies that would result with contrary interpretation).

The cases cited by Hijazi also do not support his assertion that *Bowman* has been limited to U.S. citizens. For example, *Skiriotes v. State of Florida*, 313 U.S. 69, 73–74, 61 S.Ct. 924, 85 L.Ed. 1193 (1941) presented no question of international law or extraterritorial application, since the defendant in that case was a U.S. citizen. In *U.S. v. Villanueva*, 408 F.3d 193 (5th Cir.2005) the court held that a criminal statute prohibiting the smuggling of undocumented aliens applied extraterritorially to conduct that occurred wholly outside the U.S. *Vermilya–Brown Co. v. Connell*, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), dealt with statutory construction of the term "possession of the United States" under the Fair Labor Standards Act, concluding that a U.S. military base located on a leasehold in Bermuda was a U.S. "possession" and therefore sub-

ject to the FLSA, even if some of the employees were not U.S. citizens. 335 U.S. at 381, 69 S.Ct. 140. None of these cases stand for the proposition that *Bowman* is limited to U.S. citizens.

Similarly, the cases Hijazi cites do not support his contention that the Major Fraud Statute must expressly state that it applies extraterritorially. In *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("*Aramco*") (superseded by statute), the Supreme Court held that a U.S. citizen working abroad for a U.S. employer could not pursue a Title VII action. In construing Title VII, the Court began with the presumption against extraterritoriality and found that nothing in the history or language of the statute clearly rebutted that presumption. However, *Aramco* dealt with civil liability of a private employer, not the U.S. Government's ability to defend itself against fraud and other crimes. *Bowman* was not discussed because it was not relevant. The *Aramco* Court reasoned that, adopting the plaintiffs' interpretation would mean that all employers with U.S. employees, even foreign employers in foreign countries, would be subject to Title VII. 499 U.S. at 255, 111 S.Ct. 1227; *see also Leija–Sanchez*, 602 F.3d at 798 (7th Cir.2010)("The main reason for requiring a clear legislative decision before applying a civil statute to activity outside our borders is that nations often differ with respect to acceptable conduct."). Likewise, *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 456, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007), involved patent laws, an area which, "in particular, foreign law 'may embody different policy judgments about the relative rights of inventors, competitors and the public in patented inventions.'" 550 U.S. at 456, 127 S.Ct. 1746 ("foreign law alone, not United States law, currently governs the manufacture and sale of com-

ponents of patented inventions in foreign countries."). These cases demonstrate the principle that, when extraterritorial application would amount to regulation of another country's affairs, the rationale behind the presumption is strong, but that is not the case here. *See also Foley Bros. v. Filardo*, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (federal wage law did not apply to government contractor employing U.S. citizen in foreign country); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)(National Labor Relations Act did not apply to foreign ships with foreign employees); *Benz v. Compania Naviera Hidalgo S.A.*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957)(Labor Management Relations Act did not apply to dispute between foreign ship and foreign crew); *Glass v. Kemper Corp.*, 133 F.3d 999 (7th Cir.1988)(Illinois Wage Payment and Collection Act did not apply to employee working in Spain for employer who had principal place of business in Illinois).

No such problem exists here, despite the concerns expressed by the Kuwaiti government. Applying the Major Fraud Act to Hijazi will not interfere with Kuwait's laws or governance. Defrauding a government is not the kind of activity that is allowed in one country and prohibited in another, like religious discrimination, poor working conditions, or patent appropriation. *See U.S.*

*v. Leija–Sanchez*, 602 F.3d at 799 ("The crime in *Bowman* was fraud; the Court observed that fraud was unlawful in all of the places where Bowman's scheme was implemented.").[5]

The cases cited by Hijazi do not counsel otherwise. For example, *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909)(substantial abrogation recognized by *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 947 (7th Cir.2003)), was a civil case which involved whether the Sherman Anti–Trust act applied to actions taken in Costa Rica to prevent the plaintiff from competing in the banana trade. But the acts in Costa Rica had been approved by its government and executed by its soldiers; allowing the Sherman Act to apply would have clearly interfered with Costa Rica's sovereignty. 213 U.S. at 358–59, 29 S.Ct. 511. In *U.S. v. Mitchell*, 553 F.2d 996 (5th Cir.1977), the Fifth Circuit found that the nature of the Marine Mammal Protection Act did not apply to a U.S. citizen in a foreign country, distinguishing *Bowman* on the grounds that applying the Act outside U.S. territory would interfere with other nation's governance of their own natural resources. 553 F.2d at 1002–03. Again, the Court sees no risk of interference with Kuwait's governance by prosecuting Hijazi for defrauding the U.S.

The other cases cited by Hijazi are also distinguishable. *See Yenkichi Ito v. U.S.*,

---

**5.** Hijazi argues that "the conduct of which [he] is accused is not a crime under Kuwaiti law," but he does not explain this. (d/e 16, p. 3). The assertion may be based on Kuwait's argument that the contract price was "adjusted on account of penalties to be imposed by a Kuwait State-owned Company, on account of removing these tankers from service under a lease with the Kuwait State-owned Company." (d/e 161–1, Ex. A., p. 2, letter from Kuwait Ambassador). According to this letter, the penalties were later waived. *Id.* Whether any penalties were a proper part of the bid

was contested at Mazon's trial, where the Government introduced evidence that penalties were not a proper part of the bidding process. The Government also introduced another similar subcontract executed by Hijazi with LaNouvelle shortly after the contract at issue in this case which carried no such penalties. (Mazon trial transcript, pp. 327,-336–37, 527–29, 537–541). In any ·event, whether penalties were part of the bid goes to the strength of the case against Hijazi, which is a question for the jury.

64 F.2d 73 (9th Cir.1933)(alien smuggling statute did not apply extraterritorially, but this case did not discuss *Bowman* and later 9th Circuit cases retreated from that conclusion:) *see U.S. v. Liang,* 224 F.3d 1057, 1059–1060 (9th Cir.2000); *U.S. v. Javino,* 960 F.2d 1137, 1142–43 (2d Cir.1992)(statute criminalizing possession of destructive device "made" in violation of Act only applied to devices made in U.S., where extraterritorial application would mean that "nowhere in the world may a person" violate the Act, and a different section of the Act dealt with importation); *U.S. v. Smiley,* 6 Sawy. 640 (N.D.Cal. 1864)(pre-*Bowman*)(statute against plundering sunken ships did not apply to ship sunk off Mexico coast because Mexico had jurisdiction over attempts to recover treasure).

In short, unlike the cases cited by Hijazi, here the nature of the offense (fraud against the U.S. Government) *does* create an inference of extraterritorial application under *Bowman,* and extraterritorial application does not interfere with Kuwait's sovereignty or governance.

### 2) Statutory Construction of the Wire Fraud Statute

The wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The Government contends that the term "foreign commerce" demonstrates Congressional intent for extraterritorial application. The Court agrees with Hijazi, however, that this term alone does not evince such intent, if "extraterritorial" means communications originating and ending in a foreign country. The legislative history shows that the term "foreign commerce" was added to extend the statute to wires between the U.S. and a foreign country, in response to dismissal of a criminal case involving a fraudulent phone call from Mexico to California. *Aramco,* 499 U.S. at 251, 111 S.Ct. 1227 ("we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad."); H.Rep. No. 84–2385, at 1 (1956), 1956 U.S.C.C.A.N. 3091, 3092 ("*General Statement*").

However, for the same reasons set forth for the Major Fraud Act, the Court concludes that the wire fraud statute applies to Hijazi. As discussed above, the wires that form the basis for the counts occurred either in the U.S., or were sent to the U.S. from Kuwait. Thus, this is not a case where the wires began and ended entirely in a foreign country. As discussed above, Hijazi's role in the scheme permits his prosecution for those wire frauds, even if his role was played from Kuwait. *See United States v. Adcock,* 534 F.3d 635, 640–41 (7th Cir.2008)(defendant liable even if he did not send wire, where wire transfer was "reasonably foreseeable" part of scheme); *U.S. v. Dick,* 744 F.2d 546, 552 (7th Cir.1984)(defendant held accountable for other defendant's mailings in scheme to defraud).

Second, extraterritorial application of the wire fraud statute to Hijazi can be inferred under *Bowman* by the nature of the offense alleged: a financial fraud against the United States. To find otherwise would make the U.S. vulnerable to

wire fraud depending on where the fraud was committed and who committed it, a result contrary to the rationale of *Bowman*. Accordingly, the Court concludes that the wire fraud statute may be applied extraterritorially to fraudulent schemes against the U.S. Government.[6] In light of this conclusion, the aiding and abetting statute also applies to Hijazi.

One caveat: the Court agrees with Hijazi that the wire fraud statute "reach[es] and make[s] criminal all sorts of conduct that does not involve the Government at all." (d/e 16, p. 16). However, this case is not that fact pattern. Here, the fraud did involve the U.S. Government and this Recommendation is limited to that issue alone.

## C. Hijazi's prosecution comports with international law.

This Court agrees with the Seventh Circuit that Hijazi's prosecution raises "delicate foreign relations issues." *In re Hijazi*, 589 F.3d 401, 411 (7th Cir.2009). In the Court's opinion, though, those issues are not concerns for the judicial branch. Whatever the political wisdom of Hijazi's prosecution, it is permitted under international law because governments have an internationally recognized right to protect their countries from "substantial effects" such as fraud. *Leija–Sanchez*, 602 F.3d 797, 801 (7th Cir.2010)("Even in civil litigation, the Supreme Court has held that the laws of this nation may be applied to multinational operations that have substantial effects in this nation.")(*citing F. Hoffmann–La Roche, supra*, and Restatement (Third) of Foreign Relations § 402(1)).

The Third Restatement on Foreign Relations recognizes that a country may apply its law to "conduct outside its territory that has or is intended to have substantial effect within its territory," as well as to "conduct outside its territory by persons not its nationals that is directed against the security of the state. . . ." Restatement (Third) of Foreign Relations § 402(1)(c) & (d). Fraud against the U.S. clearly has a "substantial effect" in the U.S., threatening the Government's ability to function, as explained in *Bowman*. *Id.* at § 402(f)(protective principle applies to "offenses directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes. . . ."); *F. Hoffmann–La Roche v. Empagran*, 542 U.S. 155, 165, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004)(U.S. antitrust laws can apply to foreign conduct to "redress *domestic* antitrust injury" even if doing so would interfere with foreign nation)(emphasis in original); *U.S. v. Columba–Colella*, 604 F.2d 356, 358 (5th Cir.1979)("A state/nation is competent, for example, to punish one who has successfully defrauded its treasury, no matter where the fraudulent scheme was perpetrated."); *U.S. v. Nippon Paper Industries Co., Ltd.*, 109 F.3d 1 (1st Cir. 1997).

Hijazi contends that his alleged conduct had no effect in the U.S.—"At the most, Hijazi's actions could have harmed KBR, and KBR could have passed that harm along to the U.S. government." (d/e 222, p. 18). As discussed above, however, Hijazi's conduct must be viewed in context of the alleged overall scheme to defraud the U.S. Government. Hijazi had an important role

---

**6.** Hijazi cites *U.S. v. Golitschek*, 808 F.2d 195, 197 (2d Cir.1986), in which a foreign defendant's conviction under 18 U.S.C. Section 1343 (among others) was reversed. The defendant in *Golitschek* "never set foot" in the U.S. in an alleged plot to ship helicopters from the U.S. to Iran. However, the case was reversed on faulty jury instructions, not on whether the defendant could be prosecuted under the statute. In the Court's opinion, *Golitschek* is an example of how section 1343 can be applied extraterritorially.

in this scheme: sign the subcontract with the inflated prices, bill KBR the inflated prices, and give $1 million to Mazon as a kickback. His knowledge that the U.S. was the ultimate payor is sufficiently alleged in the indictment and also supported by the terms of the subcontract and evidence introduced at Mazon's trial (though the Court does not believe that evidence is properly considered in the procedural posture of this case, *see discussion of 7th Circuit opinion, infra at section 6.*).

Section 403 of the Restatement provides a catch-all limit to extraterritorial application: jurisdiction must still be "reasonable" even if envisioned under § 402. Restatement (Third) of Foreign Relations § 403(1). Determining whether the exercise of jurisdiction is unreasonable is case and context specific, but can include considerations of the extent of the conduct within the country, and whether that conduct has a "substantial, direct, and foreseeable effect" upon the country seeking to exercise jurisdiction. Hijazi again contends that his actions had no substantial, foreseeable effect on the U.S., but as discussed above, Hijazi's role must be viewed in the context of the overall scheme to defraud the U.S., not simply the overbilling of KBR.

As discussed above, Hijazi contends that prosecuting him interferes with Kuwait's sovereignty, and Kuwait agrees. (d/e 215, Ex. A, 8/22/07 letter ("Kuwait believes that the indictment by The United States Government has impinged on the sovereign right of Kuwait to defend and practice its jurisdiction over actions that occur within Kuwait.")). Yet neither explain how the U.S. Government's efforts to protect itself from fraud interferes with Kuwait's sovereignty. Kuwait has no duty to protect the U.S. from fraud, and therefore no motivation to prosecute Hijazi or to prevent similar schemes to defraud the U.S. in the future. There is no suggestion that Kuwait would allow such a fraud against itself, regardless of where perpetrated or by whom. This is not a case where the alleged misconduct and injury all occurred in a foreign country, like *Torres* or *Baragona,* cases cited by Hijazi. *Baragona v. Kuwait Gulf Link Transport Co.,* 594 F.3d 852 (11th Cir.2010)(serviceman killed in Iraq in truck collision); *Torres v. Southern Peru Copper Corp.,* 965 F.Supp. 899 (S.D.Tex.1996)(Peruvian citizens injured by mining operations in Peru); *Columba-Colella,* 604 F.2d 356 (5th Cir.1979)(cited by Hijazi)(Mexican citizen could not be prosecuted for receiving stolen vehicle, where he received vehicle in Mexico and had nothing to do with stealing it). The injury here occurred in and directly to the United States Government: the U.S. was the alleged ultimate target of the fraud. Even if by some imagining Kuwait would permit a similar fraud against itself, that would not prevent the U.S. from protecting its own coffers from fraud. *See Bowman,* 260 U.S. at 98, 43 S.Ct. 39; *F. Hoffmann-La Roche v. Empagran,* 542 U.S. 155, 165, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004). Hijazi's prosecution does not "enact a Criminal Code for Kuwait" as Hijazi contends. (d/e 16, p. 20). Hijazi also asserts that his prosecution is unreasonable under the Restatement principles because his conduct did not harm U.S. national security or "involve drug-trafficking or any physical violence or harm to any U.S. citizen." (d/e 16, p. 19). He does admit, though, that "the immediate impact of such offense is on the U.S. Treasury." Protecting the U.S. Treasury is an important national interest, as *Bowman* demonstrates.

This is not to say that the continued prosecution of Hijazi is wise or good foreign relations policy. Mazon arguably played the more major role in the scheme yet the Government twice failed to convince a jury of his guilt. If a jury could

not be convinced of Mazon's guilt, one wonders how substantially the same evidence will convince a jury to convict Hijazi. But it is not the Court's province to determine the political wisdom of the prosecution. The Court is saying only that the prosecution is consistent with international law principles.

### D. Hijazi's prosecution comports with due process.

Exercising criminal jurisdiction over Hijazi does not comport with due process if it is "arbitrary or fundamentally unfair." *U.S. v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003); *U.S. v. Davis*, 905 F.2d 245, 248–49 (9th Cir.1990). "In further delineation of this standard, the Second and Ninth Circui" *Yousef*, 327 F.3d at 111 (2d Cir.2003)(*quoting Davis*, 905 F.2d at 248–49). The parties agree that not all Circuits have adopted the nexus test, and the Government asserts that other courts have rejected the nexus requirement in favor of the principles of international law discussed above. (d/e 217, p. 39, cases cited therein). Hijazi also borrows the standards set forth in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a civil action against a foreign corporation, in arguing that due process requires a " 'substantial connection between the defendant and the forum' based on 'an action of the defendant purposefully directed toward the forum State.' " (d/e 133, p. 28)(italics omitted). He does not, however, cite a case where *Asahi's* standard is applied in a criminal context.

The Court concludes that Hijazi's prosecution comports with due process under any of these standards. The issue again comes down to the characterization of Hijazi's actions. Hijazi characterizes his conduct as limited to, at most, fraudulent behavior directed only at KBR through actions limited to Kuwait. That, however, is not how the indictment characterizes his conduct. According to the indictment, Hijazi's actions were an important part of an overall scheme to defraud the U.S. Government. His actions must be viewed in the context of this alleged scheme, not in isolation. Purposefully scheming to defraud the U.S. Government is a sufficient nexus with the U.S. to satisfy due process requirements. *See U.S. v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987) (sufficient nexus for drug prosecution where drugs bound for U.S.)("Where an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction to arrest and try the offenders."). Taking the allegations in the indictment as true, Hijazi actions were purposefully directed to produce financial injury to the U.S.—haling him into Court is neither arbitrary, unfair, nor unexpected.

### E. The Military Extraterritorial Jurisdiction Act of 2000 ("MEJA") is inapplicable

Hijazi asserts that the MEJA "confirm[s] that Hijazi is not subject to the criminal jurisdiction of the United States." (d/e 133, p. 15). MEJA addresses criminal offenses committed outside the U.S. by U.S. forces and those employed by or accompanying U.S. forces. Simplified, it subjects those persons to the same U.S. criminal laws as if the crime had been committed within the U.S. The Act, by its definitions, does not apply to foreign residents. 32 C.F.R. § 153.5(a)(7).

Hijazi contends that MEJA is "additional evidence that Congress likely did not intend for the Major Fraud Act to apply extraterritorially." (d/e 222, p. 36). However, he does not dispute the Government's argument that MEJA was enacted

to close a " 'jurisdictional gap' " which had allowed U.S. citizens to escape punishment for the violation of U.S. criminal statutes that had no extraterritorial application, like rape, arson, robbery, and murder. (d/e 217, pp. 42–44). With that history in mind, exclusion of foreign residents from MEJA's reach is not surprising. Including foreign residents would have allowed the U.S. to prosecute foreign residents for such crimes against other foreign residents regardless of the effects on the U.S., which would clearly present international law problems. In sum, the Court agrees with the Government that MEJA is not relevant to determining whether the Major Fraud Act or the Wire Act applies extraterritorially.

### F. The Defense Cooperation Agreement is inapplicable.

On April 14, 2010, the undersigned reviewed the Defense Cooperation Agreement (hereinafter DCA) between the United States and the Country of Kuwait. Said document was brought to the undersigned for an in camera inspection by a Department of Justice employee from Washington, D.C. The DCA is classified as a "secret" document and can only be viewed by those with certain security clearance levels. The Court reviewed the DCA in full in chambers on April 14, 2010. Thereafter, the copy of the DCA reviewed by the Court was tendered to AUSA Gilmore, Central District of Illinois, who is the Security Chief for the Central District of Illinois, for storage in the U.S. Attorney's Office safe in accordance with classified document protocol. Any judge wishing to review this report and recommendation or Judge McDade's order pertaining to same, should be able to review a copy of the DCA under the same security steps as the undersigned.

The parties take competing views as to the effect of DCA on the issues herein. Defendant contends that the DCA prohibits the United States from prosecuting him for criminal acts taken entirely within Kuwait and he argues that all of his alleged actions were taken in Kuwait. In addition, the Kuwait Government has also taken the position that the DCA prohibits United States criminal prosecution over this Defendant because all of his actions, they argue, occurred in Kuwait.

The United States Government, on the other hand, contends that nothing in the DCA precludes this Defendant's prosecution and that the DCA is really immaterial herein. Further, that the U.S. Government is not relying on the DCA to obtain jurisdiction, but is relying on both United States and existing international law.

From the Court's in camera review of the DCA, the Court concludes that the DCA is completely inapplicable to this criminal cause. The classified status of the Agreement prohibits the Court from going into further detail, but, as discussed above, a judge wishing to review a copy of the DCA should be able to do so under the same security steps as the undersigned.

### G. The Seventh Circuit's opinion does not dictate a different conclusion.

In ruling on the petition for mandamus, the Seventh Circuit Court of Appeals directed the parties to file supplemental briefs on the merits of the motions to dismiss the indictment. The Seventh Circuit ultimately declined to decide the merits, however, noting that "there could be facts that the district court needs to explore; the district court is familiar with the developments in Mazon's prosecution; . . . ." *In re Hijazi,* 589 F.3d 401, 412 (7th Cir.2009). The Seventh Circuit further remarked:

Although it is a fact that KBR was operating under a contract with the U.S. government, it is not clear whether Hijazi knew or cared where KBR's money was coming from. He obviously knew that LaNouvelle was submitting a bid for fuel tankers. It might matter whether Hijazi knew that the tankers were for the use of the U.S. military, but the sketchy record we have thus far does not permit one to draw any conclusions about his knowledge.

589 F.3d at 411.

This Court is unsure what these comments mean in the posture of this case, which is to test the sufficiency of the indictment, not the strength of the evidence to support that indictment. "An indictment is sufficient if it serves three main functions. It must state the elements of the crime charged, adequately inform the defendant of the nature of the charges, and allow the defendant to plead the judgment as a bar to future prosecutions." *U.S. v. Singleton,* 588 F.3d 497, 500 (7th Cir.2009); *U.S. v. Black,* 469 F.Supp.2d 513, 518 (N.D.Ill.2006)(same). The allegations in the indictment are taken as true. *U.S. v. Moore,* 563 F.3d 583, 586 (7th Cir.2009). " 'Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence.' " *Id.* (citation omitted).

In the Court's view, the indictment already sufficiently alleges Hijazi's knowledge that the United States was the ultimate target of the fraudulent scheme. The indictment alleges that Hijazi and Mazon "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait." (d/e 59, ¶ 1). Hijazi

allegedly originally submitted a bid to KBR of about $1.7 million dollars, but then schemed with Mazon to inflate the bid, "to ensure that LaNouvelle would be overpaid." (d/e 59, ¶¶ 15,)(caps omitted). "Mazon and Hijazi signed the subcontract, knowing that the subcontract price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of La Nouvelle." (d/e 59 ¶ 16). Hijazi and Mazon allegedly both "caused LaNouvelle to send inflated invoices to KBR ... and to receive payment from KBR on those invoices." (d/e 59, ¶ 17). They also both allegedly caused KBR to submit inflated invoices to the United States and caused the United States to pay those inflated invoices. *Id.* These allegations set forth the elements of the crime, give adequate notice to Hijazi of the nature of the charges, and are specific enough for double jeopardy purposes.

To the extent that Mazon's trial is relevant, the subcontract introduced at the trial, signed by Hijazi, states that it is a subcontract for a prime contract with the U.S. Government, who is defined in the subcontract as the "Owner". (d/e 226, p. 1 of subcontract terms, sections 1.2, 1.5).[7] Completion of the subcontract was "defined as Final Notice of service delivery by the Owner." *Id.,* section 4.1 (caps omitted). The subcontract also required LaNouvelle to maintain insurance coverage which included "a waiver of subrogation to the benefit of Brown & Root, Inc. and the U.S. Government." *Id.* Sections 8.0, 13.0. Thus, the subcontract is evidence that Hijazi knew that LaNouvelle was providing fuel tankers for the U.S., and that satisfactory completion of the subcontract was in U.S. hands. Additionally, there was testimony at Mazon's trial that the "APOD" was a vast reception and staging area for

---

7. Hijazi has submitted change orders to the subcontract (d/e 228), which the Court has reviewed. They are not relevant to the Court's analysis.

U.S. and coalition military personnel and their military equipment, situated adjacent to the Kuwait International Airport. (*U.S. v. Mazon*, 05–cr–40024, trial transcript from second trial beginning 9/29/08, pp. 289–90). LaNouvelle's subcontract was to provide thousands of gallons fuel to that APOD, to be used to fuel the military vehicles and equipment that had been flown over. (Mazon trial transcript at 290, 299; d/e 226, subcontract terms section 2.0.). The large scope of the military operation at APOD is also evidence that Hijazi knew that the fuel tankers going there were for the U.S. military. There was also testimony that Hijazi had signed another subcontract for LaNouvelle to provide more fuel to the APOD, but that this second subcontract was not at an inflated price, which could be viewed as evidence to impeach Mazon's innocent explanations for that inflation. *Id.* at 536–539.

The Court has no opinion on the strength of the inferences that can be drawn from this evidence—Mazon proffered innocent explanations at his trial and the jury hung twice. The Court is only pointing out, in response to the Seventh Circuit's concerns, that there was evidence introduced at Mazon's trial to back up the indictment's allegations that Hijazi and Mazon schemed to defraud the U.S.[8]

## II. Speedy trial concerns do not warrant dismissal of the indictment.

As the Seventh Circuit stressed, Hijazi is not a fugitive. *In re Hijazi*, 589 F.3d at 412–13 (7th Cir.2009). He surrendered himself to Kuwaiti authorities, where he lawfully remains a resident. He has no legal obligation to travel to the U.S and Kuwait has no intention of turning him over. Further, there is no extradition treaty between the U.S. and Kuwait, and Kuwait has repeatedly demanded dismissal of the charges. The U.S. cannot proceed to prosecute Hijazi without his appearance unless he consents. *Id.* at 408 (*citation omitted*).

Hijazi argues that his right to a speedy trial warrants dismissal of the charges, since the case is over five years old and at an impasse with no end in sight.

[i]n considering a defendant's Sixth Amendment speedy trial challenge, we apply the following four-part test: "whether the delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."

*U.S. v. Oriedo*, 498 F.3d 593, 597 (7th Cir.2007)(relying on *Barker v. Wingo*, 407 U.S. 514, 519–20, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)(other citations omitted)). These factors are not exclusive and do not have "talismanic qualities"; there are no bright line rules, but instead "[a] balancing test [that] necessarily compels courts to approach speedy trial cases on an ad hoc

---

8. In his initial briefs, Hijazi argued that the rule of lenity (construing ambiguous criminal statutes against government) counseled against extraterritorial application. He does not press that argument in his later briefs. In any event, as discussed above, the statutes are not ambiguous because the nature of the offenses alleged against the U.S. clearly create an inference of extraterritorial application. Hijazi also argued in one of his initial briefs that extraterritorial application was unconstitutional because the U.S. Constitution only empowers Congress to " 'define and punish Piracies and Felonies on the High Seas.' " (d/e 16, p. 21). Hijazi does not pursue this argument in later briefs. In any event, the cases discussed above confirm Congress' constitutional authority to regulate conduct beyond its borders that has substantial effects within its borders, regardless of whether that conduct occurs on the high seas.

basis." *Barker,* 407 U.S. at 530, 533, 92 S.Ct. 2182. The government bears the burden of bringing the case to trial, but "if delay is attributable to the defendant, then his waiver [of a speedy trial] may be given effect...." *Barker,* 407 U.S. at 529, 92 S.Ct. 2182. The parties agree that the a five year delay is presumptively prejudicial, so the focus is on the remaining three factors.

Regarding who is to blame for the delay, Hijazi argues that the Seventh Circuit has already found it is not him because he is not a fugitive. (d/e 222, p. 38). The Seventh Circuit, though, "express[ed] no view about the arguments Hijazi has presented based on the Sixth Amendment's guarantee of a speedy trial,...." *In re Hijazi,* 589 F.3d at 410. The Seventh Circuit only relied on speedy trial principles to explain why a *ruling* on the motion to dismiss was necessary. *Id.*

Hijazi also maintains that the Government made "little effort to discharge its duty to bring this case to trial" before Kuwait made it clear that such efforts would be futile. (d/e 222, pp. 40–41). He asserts that "before Kuwait's position had hardened, the government did not make a serious effort to convince the Kuwaiti government that Hijazi should have to stand trial here." *Id.* at 41. Yet just one month after the indictment, Hijazi voluntarily surrendered himself to Kuwaiti authorities, and Kuwaiti authorities chose to release him and return his bond. This was a strong indication, coupled with the lack of an extradition treaty, that Kuwait would not be cooperating in Hijazi's prosecution. Further, that same month, the U.S. directed INTERPOL to issue a "red notice" on Hijazi, which he admits puts him at peril of arrest should he leave Kuwait. Several months later, in September 2005, the U.S. Government made a formal request to the Kuwaiti Government to turn over Hijazi.

The Court does not know what more the U.S. should have done, nor does Hijazi offer a suggestion. The cases cited by Hijazi involved the Government's failure to take obvious actions to locate and arrest a defendant, or to bring the defendant to trial, which is not the case here. *See Doggett v. U.S.,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)(government did not follow up on attempts to locate defendant, who had been living openly in U.S. for six years); *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970)(state made no effort to obtain defendant's presence for trial for eight years, though state knew that defendant was incarcerated in federal prison and defendant had repeatedly tried to obtain trial or dismissal); *U.S. v. Mendoza,* 530 F.3d 758, 763 (9th Cir.2008)(no effort to inform defendant of indictment, even though agents had phone numbers for wife and relatives); *U.S. v. Macino,* 486 F.2d 750 (7th Cir.1973)(government offered no explanation for 2½ year delay between arrest and return of indictment); *U.S. v. Ingram,* 446 F.3d 1332 (11th Cir.2006)(government did not inform defendant of indictment and efforts to find him were minimal); *U.S. v. Fernandes,* 618 F.Supp.2d 62 (D.D.C. 2009)(no attempts to extradite pursuant to extradition treaty, and no showing that those attempts would have been futile); *U.S. v. Leaver,* 358 F.Supp.2d 255, 270 (S.D.N.Y.2004)("Had the Government pursued Leaver with proper diligence, it could have located him and begun extradition proceedings years ago."); *U.S. v. Robotham,* 430 F.Supp. 1254 (D.Mass.1977)(no efforts to extradite and defendant's counsel had tried to arrange for defendant's presence in court).

In the Court's opinion, the plaintiff's status as non-fugitive has little or no bearing on determining who is responsible for the delay. Just like a fugitive in hid-

ing, Hijazi voluntarily remains beyond reach of the Government, despite the Government's due diligence. Hijazi is the only one with the power to compel a trial, either by surrendering or consenting to proceedings in his absence. A defendant lawfully living in a country with no extradition treaty, who is aware of an indictment against him, can be held responsible for the delay if he chooses to remain beyond that Government's reach. *See U.S. v. Corona–Verbera*, 509 F.3d 1105 (9th Cir.2007)(8 year delay did not violate speedy trial for defendant who was Mexican citizen residing in Mexico, where extradition efforts would have been futile); *U.S. v. Tchibassa*, 452 F.3d 918 (D.C.Cir.2006)(11 year delay did not violate speedy trial for defendant who was a citizen of and resided in Zaire, with no extradition treaty); *United States v. Blanco*, 861 F.2d 773 (2d Cir.1988)(no speedy trial violation for time period when defendant, a Columbian citizen, lawfully resided in Columbia—extradition efforts would have been futile). In short, the Court concludes that Hijazi is responsible for the delay.

As to asserting the right to a speedy trial, the failure to do so "will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. Hijazi's motion to dismiss based on speedy trial concerns does constitute an assertion of that right, in the Court's opinion. However, the assertion is hollow, since he refuses to appear for a trial, and the Government cannot compel his appearance. This is not a situation where Hijazi is powerless to obtain a trial, like the case cited by Hijazi, *Klopfer v. State of N.C.*, 386 U.S. 213, 216–218, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), where the Supreme Court held that the right to speedy trial was violated because the entry of a nolle prosequi allowed the government unlimited time to restore the charges, but yet no avenue for the defen-dant to demand a trial or to obtain dismissal. Hijazi does have an avenue to obtain a trial; he just chooses not to travel it.

Hijazi does cite one case where an alleged draft dodger living in Israel successfully move to dismiss charges under the speedy trial rules without ever appearing in court, but the Government in that case had not exercised due diligence to obtain the defendant's presence at trial. *U.S. v. Salzmann*, 548 F.2d 395, 404 (2d Cir.1976). The defendant in *Salzmann* had written the Government, asserting that he was unable to afford the trip to appear for trial. The Government failed to inquire into the truth of this assertion or offer to pay for the trip; the Government further admitted that its failure to pay for the trip, if the defendant was in fact impoverished, amounted to a lack of due diligence. The Court in *Salzmann* held that this admission was enough to show that the Government had not been diligent, thus justifying the dismissal of the indictment.

Unlike *Salzmann*, the Government in this case was diligent. There is no indication that the Government failed to take any steps that could have reasonably procured Hijazi's presence. *Salzmann*, therefore, does not help Hijazi. For the same reasons, the prejudice to Hijazi from the delay does not compel dismissal. Hijazi has the power to prevent that prejudice, so its existence does not weigh much in his favor. *See U.S. v. Reumayr*, 530 F.Supp.2d 1200 (D.N.M.2007)("Since most of the delay is attributable to Defendant, however, the prejudice he has suffered cannot be weighed against the Government."); *see also U.S. v. Watkins*, 983 F.2d 1413, 1419–20 (7th Cir.1993)(criminal defendant may lose right to be present by consent or misconduct); *Clark v. Stinson*, 214 F.3d 315, 323 (2d Cir.2000) (criminal

defendant can knowingly and voluntarily waive right to be present at trial).

Hijazi argues in the alternative that dismissal under Federal Rule of Criminal Procedure 48 is warranted due to the "unnecessary delay ... in ... bringing a defendant to trial." Fed.R.Crim.P. 48(b). "Rule 48 'is not circumscribed by the Sixth Amendment,' ...; however, ... it is driven 'by the same general considerations as the Sixth Amendment.'" *U.S. v. Ward,* 211 F.3d 356, 361–62 (7th Cir.2000)(cites to 8th Circuit cases omitted). As discussed above, the delay is attributable to Hijazi's choice to remain beyond the Government's reach. That choice is within Hijazi's rights, but it is not without consequences. *See Reumayr,* 530 F.Supp.2d at 1207 ("Defendant contends he should not be forced to choose between his lawful right to resist extradition and his right to a speedy trial. However, the two rights are incompatible, and therefore a defendant can indeed be forced to choose between the two.").[9]

WHEREFORE, the Court RECOMMENDS that Defendant's Motions to Dismiss be denied (d/e's 15, 131, 174).

Any objections to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to timely object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir.1986). See also Local Rule 72.2.

---

**9.** Rule 48(b) has been held to apply only to postarrest delays, so the Court is not sure that Rule 48(b) even applies, but the Government does not make this argument. *U.S. v. Blanco,* 861 F.2d 773, 780 (2d Cir.1988) ("Rule 48(b) only applies to delays following arrest" not prearrest delays) (*citing United States v. Marion,* 404 U.S. 307, 319, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)).